## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PRAIRIE BAND POTTAWATOMIE NATION;  )
SIERRA CLUB; WETLANDS PRESERVATION  )
ORGANIZATION; JAYHAWK AUDUBON  )
SOCIETY; SAVE THE WAKARUSA WETLANDS,  )
INC.; KANSAS UNIVERSITY ENVIRONS; and  )
ECOJUSTICE,  )
        )
      **Plaintiffs,**  )
        )      **CIVIL ACTION**
**v.**  )
        )      **No. 08-2534-KHV**
FEDERAL HIGHWAY ADMINISTRATION and  )
KANSAS DEPARTMENT OF TRANSPORTATION,  )
        )
      **Defendants.**  )
_____)

### MEMORANDUM AND ORDER

The Prairie Band Pottawatomie Nation, Sierra Club, Wetlands Preservation Organization, Jayhawk Audubon Society, Save the Wakarusa Wetlands, Inc., Kansas University Environs and EcoJustice bring suit against the Federal Highway Administration ("FHWA") and the Kansas Department of Transportation ("KDOT"). Plaintiffs challenge the Record of Decision in which the FHWA selected a particular route – the 32B Alternative – for the South Lawrence Trafficway, a proposed highway project in Lawrence, Kansas. Plaintiffs seek judicial review under the Administrative Procedure Act, 5 U.S.C. §§ 551-59, 701-06 ("APA"), and ask the Court to reverse and remand the FHWA decision based on alleged violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321-47 ("NEPA"), Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303 ("Section 4(f)") and the National Historic Preservation Act, 16 U.S.C. § 470 ("NHPA"). The Court previously dismissed plaintiffs' claims under the Clean Water Act, 33 U.S.C. §§ 1251-1387, and the American Indian Religious Freedom Act, 42 U.S.C. § 1996. See Memorandum And Order

(Doc. #32) filed November 18, 2009. This matter is before the Court on <u>Plaintiffs' Amended Opening</u> <u>Brief</u> (Doc. #48) filed March 23, 2010, which the Court construes as a motion for judicial review, and the <u>Federal Defendant's Motion To Strike Exhibits With Memorandum In Support Included</u> (Doc. #53) filed May 28, 2010. For the reasons set forth below, albeit with misgivings, the Court affirms the FHWA Record of Decision.

## Statutory and Regulatory Framework

Federally funded highway projects, such as the South Lawrence Trafficway ("SLT"), must comply with a number of federal environmental protection and historic preservation laws. These include NEPA, the NHPA and Section 4(f) of the Department of Transportation Act. Plaintiffs bring claims under each of these three statutes. The relevant statutory provisions, and their accompanying regulations, frame the Court's decision. The Court therefore begins by outlining the specific statutory and regulatory framework applicable to the issues plaintiffs raise.

### National Environmental Policy Act

Among other things, Congress enacted NEPA to "encourage productive and enjoyable harmony between man and his environment" and "to promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. Accordingly, NEPA requires federal agencies to assess potential environmental consequences of proposed federal action. <u>Morris v. U.S. Nuclear Regulatory Comm'n</u>, 598 F.3d 677, 690 (10th Cir. 2010). NEPA does not mandate that agencies achieve particular substantive environmental results. <u>Marsh v. Ore. Natural Res. Council</u>, 490 U.S. 360, 371 (1989). Instead it focuses the attention of the government and the public on the environmental effects of proposed agency action. It does so by imposing "action-forcing" procedural requirements that require agencies to take a "hard look" at the environmental impact of certain agency actions. <u>Morris</u>,

598 F.3d at 690; see also 40 C.F.R. §§ 1500.3, 1502.1.  NEPA and its implementing regulations require agencies to produce a detailed environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C)(i); see also 40 C.F.R. Part 1502.[1]  An EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives," including "the alternative of no action," and must "briefly discuss" alternatives which were eliminated from detailed study.  40 C.F.R. §§ 1502.14(a)-(c).  Among other things, it must discuss direct and indirect effects of each alternative; any potential conflict between the alternative and Federal, regional, state and local land use plans; any historic and cultural resources; and means to mitigate adverse environmental impacts.  Id. §§ 1502.14, 1502.16.  A draft ("DEIS") or a final ("FEIS") EIS must be supplemented if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  Id. § 1502.10; 23 C.F.R. § 771.130.

NEPA regulations also require the FHWA to "determine and analyze expected traffic noise impacts and alternative noise abatement measures to mitigate these impacts."  23 C.F.R. § 772.9(a).  The traffic noise analysis must (1) identify existing activities and lands that may be affected by noise from the highway; (2) predict traffic noise levels; (3) determine existing noise levels; (4) determine traffic noise impacts (i.e., impacts that occur when predicted traffic noise levels approach or exceed the noise abatement criteria or substantially exceed the existing noise levels); and (5) examine and evaluate alternative noise abatement measures for reducing or eliminating noise impacts.  Id.  NEPA regulations

---

[1]        NEPA is implemented by regulations issued by the Council on Environmental Quality ("CEQ"), 40 C.F.R. Parts 1500 through 1508, which are supplemented by regulations that prescribe FHWA and Federal Transit Administration policies and procedures for implementing NEPA, 23 C.F.R. Parts 771 and 772, among others.

set noise abatement criteria ("NAC") for five types of land and land use activities, each of which is assigned a noise level which, if approached or exceeded, requires the FHWA to consider noise mitigation measures such as constructing noise barriers or acquiring property to create a "buffer zone." Id. §§ 772.5(g), 772.11(c), 772.13(c); 23 C.F.R. Part 772, Table 1.

### National Historic Preservation Act

Section 106 of the NHPA and its implementing regulations require the head of any federal agency with jurisdiction over a federally funded or licensed project to "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register [of Historic Places]." 16 U.S.C. § 470f; see also 36 C.F.R. Part 800. Like NEPA, the NHPA imposes purely procedural – not substantive – requirements. Valley Cmty. Pres. Comm'n v. Mineta, 373 F.3d 1078, 1085 (10th Cir. 2004). First, the agency must assess whether the project has the potential to affect historic properties. 36 C.F.R. § 800.3. If it does, then the agency must (1) identify appropriate parties to participate in the Section 106 review process, including the State Historic Preservation Officer ("SHPO"), id.; (2) identify historic properties and evaluate their historic significance, id. § 800.4; (3) assess any direct or indirect adverse effects the project would have on the identified historical properties, id. § 800.5; and (4) attempt to resolve the adverse effects by "evaluat[ing] alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties," id. § 800.6. Adverse effects generally include physical destruction of or damage to historic property as well as visual, atmospheric or audible disturbances that diminish the integrity of significant historic features of the property. Id. § 800.5(a)(2). These adverse effects are typically resolved by memorandum of agreement ("MOA") between the agency and the SHPO. See id. § 800.6. The MOA would evidence compliance with Section 106 requirements and

govern the agency's implementation of the project, including any avoidance or mitigation measures the agency must take. See id.

**Section 4(f) of the Department of Transportation Act**

Unlike NEPA and the NHPA, Section 4(f) of the Department of Transportation Act imposes substantive limits on the discretion of the Secretary of Transportation to approve a federally-funded transportation project that uses "publicly owned land of . . . an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site)." 49 U.S.C. § 303(c).[2] Section 4(f) lands include sites identified by NHPA's Section 106 process. See Valley Cmty. Pres. Comm'n, 373 F.3d at 1085. The Secretary may only approve a project that uses Section 4(f)-protected land if "(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. § 303(c); 23 C.F.R. §§ 771.135, 774.3. "A feasible and prudent avoidance alternative avoids using Section 4(f) property and does not cause other severe problems of a magnitude that substantially outweighs the importance of protecting the Section 4(f) property." 23 C.F.R. § 774.17.[3] If "there is no

---

[2]     An "historic site" is "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register [of Historic Places]." 23 C.F.R. § 774.17.

[3]     An alternative is not feasible if it cannot be built as a matter of sound engineering judgment. 23 C.F.R. § 774.17.

An alternative is not prudent if:

(I) It compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need;

(continued...)

feasible and prudent avoidance alternative, then the [Federal Highway] Administration may approve,

from the remaining alternatives that use Section 4(f) property," the alternative that "causes the least

overall harm in light of the statute's preservation purpose" and "include[s] all possible planning."

23 C.F.R. § 774.3(c).  Protection of Section 4(f) property is to be given "paramount importance."

Citizens to Pres. Overton Park v. Volpe, 401 U.S. 402, 412-13 (1971). Therefore, if the FHWA selects

an alternative that uses Section 4(f) property, its selection must be supported by information which

demonstrates that "there are unique problems or unusual factors involved in the use of alternatives that

avoid these properties or that the cost, social, economic, and environmental impacts, or community

disruption resulting from such alternatives reach extraordinary magnitudes."  23 C.F.R. § 771.135;

---

[3](...continued)
    (ii) It results in unacceptable safety or operational problems;

    (iii) After reasonable mitigation, it still causes:

    (A) Severe social, economic, or environmental impacts;

    (B) Severe disruption to established communities;

    (C) Severe disproportionate impacts to minority or low income populations; or

    (D) Severe impacts to environmental resources protected under other Federal
    statutes;

    (iv) It results in additional construction, maintenance, or operational costs of an
    extraordinary magnitude;

    (v) It causes other unique problems or unusual factors; or

    (vi) It involves multiple factors in paragraphs (3)(I) through (3)(v) of this
    definition, that while individually minor, cumulatively cause unique problems or
    impacts of extraordinary magnitude.

23 C.F.R. § 774.17.

Overton Park, 401 U.S. at 413.

## Standard and Scope of Review

The Court reviews the FHWA's Record of Decision as a final agency action under the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 702, 704; see Valley Cmty. Pres. Comm'n, 373 F.3d at 1084-85; Davis, 302 F.3d at 1111.[4] Section 706 of the APA defines the scope of this Court's review. It provides that the reviewing court shall hold unlawful and set aside agency action, findings and conclusions found to be "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. §§ 706 (2)(A), (C), (D). Although the FHWA is "entitled to a presumption of regularity," the Court must engage in a "thorough, probing, in-depth review." Overton Park, 401 U.S. at 415. The ultimate standard of review, however, is a narrow one; the Court may not substitute its judgment for that of the agency. Id. at 416. The focus of the Court's narrow review is the administrative record already in existence, not some new record made initially before this Court. Camp v. Pitts, 411 U.S. 138, 142 (1973); see also Olenhouse v. Commodity Credit Corp., 42 F.3d 1560 (10th Cir. 1994).[5]

---

[4] Section 704 of the APA requires that an action be "final" to be judicially reviewable. 5 U.S.C. § 704. Here, the final decision is embodied in a final Record of Decision, ROD, Admin. Record ("AR"), Vol. 3 at 1794, 1799, which is final for purposes of the APA. See Forest Guardians v. U.S. Forest Serv., 579 F.3d 1114, 1118 (10th Cir. 2009).

[5] The FHWA moves to strike Exhibits 5, 6, 14 and 15 attached to Plaintiffs' Opening Brief (Doc. #48). It argues that the Court should not consider these exhibits because they include evidence not contained in the administrative record. Doc. #53 at 2. Plaintiffs contend that the Court may consider these exhibits because Exhibits 5 and 6 contain only evidence taken from the administrative record, and Exhibits 14 and 15 should be judicially noticed under Fed. R. Evid. 201. Plaintiff's Response To Federal Highway's Motion To Strike Exhibits (Doc. #58) at 3-7. The Court rules on Exhibits 5, 6, 14 and 15 in notes 38, 43, 44 and 46 respectively.

**Factual and Procedural Background**

The following facts are taken from the administrative record, which consists of nearly 8,000 pages and is summarized in the parties' briefs. The FHWA brief, Doc. #55 at 5-19, contains an excellent summary of the facts leading up to this dispute. The Court incorporates it by reference and assumes that the reader is familiar with its contents.

**South Lawrence Trafficway History and Purpose**

A highway bypass around the City of Lawrence, Kansas has been debated since the 1960s. Final Environmental Impact Statement ("FEIS"), Admin. Record ("AR"), Vol. 2 at 551. A western segment was completed in the 1990s, but for a variety of reasons, the eastern segment has remained in limbo. See FEIS, AR, Vol. 2 at 552. The current proposal for the SLT has a long and contentious history. 2025 Roadway System Plan, AR, Vol. 1 at 400; see also Ross v. Fed. Highway Admin., 162 F.3d 1046 (10th Cir. 1998). It generally calls for a seven-mile, four-lane divided freeway along the southern edge of the City on an alignment now known as the 32nd Street Alignment B Alternative. Id. at 553. The SLT would connect the existing K-10 Highway/US-59 Highway (Iowa Street) interchange in southwest Lawrence to K-10 Highway on the eastern edge of Lawrence in eastern Douglas County, Kansas. Id.

At present, K-10 Highway is routed through Lawrence on heavily congested city streets. See id. at 554-55. This route creates unacceptable and unsafe driving conditions. See id. at 553-55. These conditions are predicted to worsen because the streets cannot handle the traffic volume and have poor point-of-access control. See id. The SLT is therefore necessary "to provide a safe, efficient, environmentally sound and cost-effective transportation facility for users of K-10 Highway and the surrounding state highway system and, to the extent possible, to alleviate congestion on Lawrence city

streets." FEIS, AR, Vol. 2 at 553-54.

**South Lawrence Trafficway Administrative Process**

Construction of the proposed SLT would involve dredging and placing fill material in U.S. waters. KDOT was therefore required to obtain a permit from the Corps of Engineers ("Corps") under Section 404 of the Clean Water Act. See FEIS, AR, Vol. 2 at 525; see also 33 U.S.C. § 1344.[6] Granting the Section 404 permit would constitute a "major" federal action that would significantly affect the quality of the human environment. As a result, NEPA required the Corps to issue an Environmental Impact Statement ("EIS"). See FEIS, AR, Vol. 2 at 525, 553; see also 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. Part 1502. NEPA also required the Corps to comply with NHPA provisions that require sites eligible for listing on the National Register of Historic Places to be protected, 16 U.S.C. § 470f; 36 C.F.R. Part 800. In 2005, Congress appropriated federal funding for the SLT project. That appropriation required the FHWA to oversee the project for purposes of ensuring compliance with the NHPA and Section 4(f). See AR, Vol. 4 at 3385-87; see also Doc. #55 at 11. Under Section 4(f), the FHWA may not approve the project unless there is no prudent and feasible alternative and the project includes all possible planning to minimize harm to protected property. See 49 U.S.C. § 303(c); 23 C.F.R. §§ 771.135, 774.3.

**NEPA Process for the SLT**

In May of 2001, KDOT provided the Corps of Engineers with written notification that it was evaluating an SLT proposal. FEIS, AR, Vol. 2 at 552. The letter noted that KDOT would need a

---

[6] Plaintiffs initially brought claims for Clean Water Act violations. The Court dismissed those claims noting that they were "more accurately classified as claims under NEPA because they focus on the adequacy of the Final EIS and defendants' alleged failure to consider alternative routes for the SLT." Memorandum And Order (Doc. #32) at 6-8.

Section 404 permit for the project and asked that the Corps' Kansas City District become the lead agency for purposes of ensuring compliance with NEPA and the NHPA and determining whether to grant the KDOT application. Id. at 552-53.[7] In August of 2001, the Corps issued a notice of intent to prepare a Draft EIS ("DEIS"). Id. at 559. The Corps thereafter engaged in a "scoping" process to determine what issues to address in the DEIS and identify significant issues related to the proposed SLT. Id.[8] This included a public "scoping" meeting and a time for public comment. Id. The Corps issued a DEIS in August of 2002, id. at 755, and after a public notice and comment period, issued a Final EIS ("FEIS") in December of 2002, id. at 519.

The Corps identified 27 alternatives. It then narrowed the alternatives to 12, each of which it discussed in detail in its DEIS and FEIS. FEIS, AR, Vol. 2 at 2538. The 12 reasonable alternatives included two "no-build" alternatives: (1) a "no-action" alternative and (2) an enhanced public transit alternative. They also included ten "build" alternatives: (1) an upgrade to the existing K-10 highway link; (2) the 31st Street Alternative; (3) the 32nd Street Alternative; (4) the 35th Street Alternative; (5) the 38th Street Alternative; (6) the 42nd Street Alternative; (7) a far east and south corridor; (8) a

---

[7]     KDOT did not officially submit its Section 404 permit application until July of 2002. FEIS, AR, Vol. 2 at 525. The parties state in various pleadings and motions that KDOT submitted the Section 404 permit application to the Corps of Engineers in 2001, Doc. #1 ¶¶ 63-64; Doc. #11 ¶¶ 63-64; Doc. #13 ¶¶ 2, 16; Doc. #55 at 6, but the administrative record reflects that KDOT submitted the application in July of 2002, FEIS, AR, Vol. 2 at 525. The parties appear to be referring to KDOT's May 2001 letter to the Corps, not its actual Section 404 permit application.

[8]     "Scoping" is "an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action." 40 C.F.R. § 1501.7. As part of the scoping process the lead agency shall "[d]etermine the scope (§ 1508.25) and the significant issues to be analyzed in depth in the environmental impact statement." 40 C.F.R. § 1501.7(a)(2). The "scope" of an EIS "consists of the range of actions, alternatives, and impacts to be considered." 40 C.F.R. § 1508.25. "Alternatives" that must be considered include a no-action alternative, other reasonable courses of action, mitigation measures, and direct, indirect and cumulative impacts. Id. § 1508.25(b), (c).

far south corridor; (9) an eastern bypass; and (10) a tunnel.  See FEIS, AR, Vol. 2 at 567-69.  Using a

five-step screening process, the Corps developed and evaluated the 12 alternatives.  Id.  In step one, the

Corps developed 13 reasonable alternative alignments from six of the ten alternatives – the no-build

alternative and the 31st Street, 32nd Street, 35th Street, 38th Street and 42nd Street corridors.  The

Corps selected each alternative based on its ability to meet the purpose and need of the project and

attract sufficient traffic from the existing K-10 Highway city route, the cost of construction, and

maintenance and the associated environmental impacts.  Id. at 569.[9]  To permit more detailed study, the

Corps considered each alignment as a separate alternative.  Id.  In steps two, three and four, the Corps

narrowed the 12 reasonable "build" alternatives to two finalists: the 32nd Street Alignment B

Alternative ("32B Alternative" or "32B")  and the 42nd Street A Alternative ("42A Alternative" or

"42A").  Id. at 570.[10]  In the fifth and final screening, the Corps compared the 32B and 42A alternatives,

and selected 32B over 42A.  Id.

The Corps commissioned URS, a contractor, to complete a traffic noise study, as required by

NEPA regulations.  See FEIS, AR, Vol. 2 at 893.  URS performed the noise study in accordance with

---

[9]        In step one, the Corps concluded that the no-build alternative did not satisfy the purpose
and need of the project.  It kept the no-build alternative in its analysis, however, because NEPA
requires the Corps to compare other alternatives against it.  FEIS, AR, Vol. 2 at 573 n.5.

[10]        In the first screening, the Corps identified 12 reasonable "build" alternatives that were
technically and economically feasible and addressed the purpose and need of the project: 31st Street,
32nd Street (and five alternative alignments), 35th Street (and two alternative alignments), 38th Street
(and two alternative alignments), and 42nd Street (and two alternative alignments).  FEIS, AR, Vol.
2 at 573-74.  In the second screening, the Corps eliminated the 31st Street corridor, the 35th Street
corridor and its alignments, and the 38th Street corridor and its alignments.  Id. at 588-89.  In the third
screening, the Corps narrowed the seven remaining alignments to four – the two most feasible
alignments in the 32B and the 42A corridors.  Id. at 592-93.  In the fourth screening, the Corps
identified the 32B Alternative and 42A Alternative as the preferred alternatives and compared the two.
Id. at 69-70, 593-649.  In the fifth and final screening the Corps reviewed the two remaining
alternatives and selected the 32B Alternative over the 42A Alternative.  Id. at 70.

federal regulations, and the Corps included it in its FEIS. See id. 662, 890, 892. Using FHWA Traffic Noise Model software, URS measured existing noise levels in the affected area and estimated future noise levels for the no-build, 32B and 42A alternatives. Id. at 893, 895. The traffic noise study did not compare existing noise levels to predicted noise levels, id. at 894, but did include "increase over existing" noise-level data in tables which it attached to the report. Id. at 902-05. URS tentatively concluded that noise barriers would successfully mitigate the noise impacts of the 32B Alternative. Id. at 896. Based on the study data, the Corps concluded that the 42A Alternative would have greater noise impacts on the Haskell Agricultural Farm Property, which is at the center of this litigation, than the 32B Alternative after mitigation. Id. at 536-37, 602.[11] It determined that 42A would draw more cars onto the streets that surround the Haskell Farm (Haskell Avenue, Louisiana Street and 31st Street). See id. The additional traffic would generate increased noise, light, urban debris and visual disturbances, and would ultimately require that one or more of the streets be expanded from two lanes to four. Id.

In June of 2003, after the Corps had issued the FEIS, the Prairie Band Pottawatomie Nation ("PBPN") proposed an additional alternative alignment for the 42nd Street corridor which it called the 42nd Street Alignment C Alternative ("42C Alternative"). The PBPN proposed the 42C Alternative because it thought that 42A required an unnecessarily long eastern bridge across the Wakarusa River. ROD, AR, Vol. 3 at 1846, 2511. It asserted that the 42C Alignment would reduce by $19 million the bridge costs of the 42A Alternative by replacing the one long eastern bridge with three shorter bridges.

---

[11]     The impact of each alternative on the Haskell Agricultural Farm Property, which includes the Baker Wetlands, is at the heart of this litigation. The farm property and the impacts of each alternative on it are described in detail below in sections titled "NHPA Process for the SLT" and "Department of Transportation Act Section 4(f) Process."

Id.[12]  The PBPN calculated that the 42C Alignment would cost approximately the same as the 32B

Alignment.  Id.  Accordingly, the PBPN asked the Corps to perform a detailed engineering study and

cost estimate for the 42C Alignment.  Id.  Representatives of the Corps met with the PBPN's attorney

in June of 2003 to discuss the PBPN's proposed alternative.  Id. at 1846-47; 2538-40.  The Corps later

responded in writing to the PBPN's concerns.  Id.  The response stated that the Corps had considered

a route similar to the proposed 42C Alignment in the scoping – pre-DEIS – phase, but had rejected it

early in the process in favor of 42nd Street alignments that were safer, less curved and better suited to

meet highway design standards.  Id. at 2538-39.  In addition, the Corps stated that the 42C Alternative

would cost only $5.3 million less – not $19 million less – than the 42A Alternative, and would cost

nearly $13 million more than the 32B Alternative.[13]  Id.  It also noted that cost was only one of many

factors which the Corps considered in selecting the 32B Alternative.  Id.  The FHWA later adopted the

Corps' FEIS and incorporated it into its Final Section 4(f) Evaluation and Record of Decision.  FHWA

ROD, AR, Vol. 10 at 7737.  Upon plaintiffs' request that the FHWA issue an SEIS, the FHWA

reevaluated the Corps' FEIS and determined that an SEIS was not necessary.  Id. at 7441-46.

In December of 2003, the Corps issued a Record of Decision ("Corps ROD") that identified the

32B Alternative as the "selected alternative."  Corps ROD, AR, Vol. 3 at 1794, 1799.  The Corps

---

[12]     Plaintiffs consistently assert that the 42C Alternative would be *roughly* $10-20 million
cheaper than 42A, but their exact estimates vary, ranging as high as $22.9 million.  See Doc. #62 at
16.

[13]     The primary reason for the difference between plaintiffs' cost estimate and the Corps'
estimate for the 42C Alternative is that the plaintiffs' estimate is based on construction costs for two-
lane roads and bridges whereas the Corps' estimate is based on construction costs for four-lane roads
and bridges.  Corps ROD, AR, Vol. 3 at 1850-52.  The Corps used the four-lane estimate because
KDOT's Section 404 permit application requested authorization to construct a "four-lane freeway" and
because it calculated the costs of the other alternatives, including the 32B Alternative, based on four
lane roads and bridges.  Id.

selected 32B over 42A based on six factors: (1) safety, (2) efficiency, (3) land use impact, (4) direct wetland impact, (5) impact on cultural and historic sites and (6) cost. Id. at 1803; FEIS, AR, Vol. 2 at 593-98. After considering the cumulative direct and indirect impacts of each alternative, it concluded that the 32B Alternative was a better alternative than the 42A Alternative on four of the six factors: safety, efficiency, land use impact and cost. FEIS, AR, Vol. 2 at 598. With respect to each of these factors the Corps considered the mitigation measures included in each alternative. FEIS, AR, Vol. 2 at 600-01, 606. It noted that the 32B Alternative included significant mitigation measures to offset the natural, social and cultural impacts of the plan, id.,[14] and that 42A required measures to mitigate impacts on the William Meairs Farmstead, which is eligible for listing on the National Register of Historic Places, see FEIS, AR, Vol. 2 at 536.

**NHPA Process for the SLT**

Pursuant to Section 106 of the NHPA, the Corps was required to take into account the effects of the SLT on historic properties.[15] To determine whether the SLT would affect Section 106-protected properties, the Corps defined an area of potential effect for the proposed project and hired a consultant, Dr. Paul Brockington, to determine whether any sites potentially affected by the various SLT alignments were protected by the NHPA (i.e., eligible for the National Register of Historic Places). See Brockington Report, FEIS, AR, Vol. 2 at 1122-98. Throughout the process, the Corps consulted individuals, organizations, agencies and tribes with interests in the area. FEIS, AR, Vol. 2 at 658. The

---

[14] The 32B mitigation plan is fully discussed infra at 19-20. See also FEIS, AR, Vol. 2 at 600-12.

[15] An historic property is a property that has historical importance to any person or group, which includes the types of districts, sites, buildings, structures or objects eligible for inclusion, but not necessarily listed, on the National Register. FEIS, AR, Vol. 2 at 658.

Corps then consulted both the Kansas State Historic Preservation Office ("SHPO") and the Keeper of the National Register of Historic Places ("Keeper") to reach a final determination. Determination of Eligibility Notification, FEIS, AR, Vol. 2 at 1119. In its review, the Corps identified four historic properties within the SLT Area of Potential Effect: (1) Haskell Institute Historic District, (2) Haskell Institute National Historic Landmark, (3) H. Eggert Family Property, and (4) William Meairs Farmstead. FEIS, AR, Vol. 2 at 659.

The Haskell Institute Historic District ("HIHD" or "District"), which is the site of the former Haskell Institute, is at the center of this litigation. It consists of the southern half of the present-day Haskell Indian Nations University ("HINU") campus, twelve discontiguous structures on the northern half of the HINU campus that constitute a National Historic Landmark, and all of the Baker Wetlands. FEIS, AR, Vol. 2 at 659. In its EIS, the Corps concluded that the HIHD was eligible for listing as a Historic District on the National Register. Id. At least in part, it reached this conclusion because it misinterpreted the Keeper's determination of whether the District was National Register-eligible. See id. At 659-60. After the Corps issued its FEIS the Keeper clarified its position and the Corps' ROD corrected its National Register eligibility determination. ROD, AR, Vol. 3 at 1813. Consistent with the Keeper's finding, the Corps' ROD concluded that the HIHD as a whole was not National Register-eligible, but that portions of it were individually eligible: the Haskell Agricultural Farm Property ("Haskell Farm" or "HAFP"), which includes the Upper Fields portion of the HINU campus (located north of 31st Street),[16] the Baker Wetlands (south of 31st Street),[17] and the 12 structures comprising a

---

[16]     The Haskell Farm is eligible to be on the National Register of Historic Places as a historic site because it reflects the essential role of agricultural training in the early history of the Haskell School and the diverse historic uses of the lands south of the core campus. FEIS, AR, Vol. 2 at 1119-20. Although the Haskell Farm has been modified, it retains the essential physical

(continued...)

discontiguous National Historic Landmark on the northern half of the HINU campus.[18] ROD, AR, Vol. 2 at 1813, 1119-20.

The Corps concluded that the 42A Alternative would have no direct negative effect on the historic properties,[19] but that it would have substantial negative indirect effects on the Haskell Farm. ROD, AR, Vol. 3 at 1804-06.[20] It also concluded that the 32B Alternative would affect the Haskell Farm

---

[16](...continued)
characteristics associated with the area from the historic period, including land use patterns, spacial organization, circulation networks and small scale elements such as the water control systems and structures. Id. Historically, the Haskell Farm property was open land; modern views of the property, however, include a few trees which do not appear in historic photographs. Id. at 1153. According to the National Park Service's National Register of Historic Places, the "differences in appearance are relatively minor and do not constitute a significant loss of [historic] integrity" in part because there is little modern structural intrusion on the wetlands. Id. at 1153-54.

[17]     The Baker Wetlands, which were originally part of the Haskell Institute, are on the National Park Service's National Registry of Natural Landmarks as wetlands. Brockington Report, FEIS, AR, Vol. 2 at 1130. They are eligible for the National Register of Historic Places as a traditional cultural property. FEIS, AR, Vol. 2 at 659,

[18]     The 12 sites include Pocahontas Hall, Pushmataha Hall, Bandstand, Tecumseh Hall, Hiawatha Hall, Auditorium, Haskell Arch, Haskell Stadium, Old Dairy Barn/Warehouse, Powhatan Hall, Kiva Hall and Haskell Indian Cemetery. Determination of Eligibility Notification, FEIS, AR, Vol. 2 at 1119.

[19]     The Corps' ROD noted that the 42A Alternative would directly affect the William Meairs Farmstead, but that any adverse impact could be resolved through mitigation. Corps ROD, AR, Vol. 3 at 1806.

[20]     The NEPA implementing regulations (40 C.F.R. Parts 1500 – 1508) require the scope of an EIS to include "cumulative actions" and to address "indirect effects" and their significance. Under 40 C.F.R. Part 1508.7, "cumulative impacts" are those impacts on the environment which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Under 40 C.F.R. Part 1507, cumulative impacts can result from individually minor but collectively significant actions that take place over a period of time. Under 40 C.F.R. Part 1508.8, "indirect effects" are those effects that are caused by the action but are later in time or farther removed in distance, but still reasonably foreseeable. Indirect effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate,

(continued...)

and the Baker Wetlands just south of the HINU southern boundary between Louisiana Street and Haskell Avenue and roughly 700 feet south of present-day 31st Street. FEIS, AR, Vol. 2 at 578; ROD, AR, Vol. 3 at 2760. The effects would include physical, audible and visual impacts on various historic structures including dikes, canals, roads, bridges and water control gates. Id. The Corps recommended a variety of mitigation measures to minimize the negative effects of the 32B Alternative, and the Corps, the SHPO, KDOT, Baker University, Douglas County and the Advisory Council on Historic Preservation memorialized these mitigation measures in a Memorandum of Agreement. Corps ROD, AR, Vol. 3 at 2930-35. Notwithstanding the direct impacts of the 32 Alternative on Section 106 property, the Corps selected 32B over 42A because of the cumulative indirect impacts associated with 42A as well as the extensive 32B mitigation plan. Id. at 1807-09.

### Department of Transportation Act Section 4(f) Process

In 2005, Congress appropriated federal funds for the SLT project, which required the FHWA to oversee the project and ensure that it complied with federal law. See AR Vol. 3 at 3368. Pursuant to Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303, the FHWA published in the Federal Register a Notice of Intent to adopt the Corps' FEIS, to prepare a draft and final Section 4(f) evaluation for the project and to issue a Record of Decision ("FHWA ROD"). Id. at 386-87.[21] The

---

[20](...continued)
and related effects on air and water and other natural systems, including ecosystems. 40 C.F.R. Part 1508. The Council on Environmental Quality's Fifth Annual Report, 410-11, December 1974, states that secondary and induced effects must be considered and may be more significant than the project's primary effects.

[21]    The FHWA published a Draft Section 4(f) Evaluation in November of 2006, Draft Section 4(f) Evaluation, AR, Vol. 7 at 5223, solicited public comments through January of 2007, AR, Vol. 8 at 6134, and published its Final Section 4(f) Evaluation in November of 2007, Final Section 4(f) Evaluation, AR, Vol. 10 at 6824.

FHWA identified two Section 4(f)-protected properties within the SLT impact area: the Haskell Agricultural Farm Property and the William Meairs Farmstead. Draft Section 4(f) Evaluation, AR, Vol. 7 at 5239; Final Section 4(f) Evaluation, AR, Vol. 10 at 6842. The Haskell Farm consists of the upper fields on the current Haskell Indian Nation University campus (north of 31st Street) and the Wakarusa River flood plain area south of 31st Street known as the Baker Wetlands. Final Section 4(f) Evaluation, AR, Vol. 10 at 6842. The William Meairs Farmstead is located immediately adjacent to the 42A Alternative on the west side of E 1400 Road and is eligible for listing on the National Register of Historic Places because of its architecture, condition and association with the agriculture of Douglas County, Kansas.[22] Id. at 6852.

The FHWA adopted the Corps of Engineers' screening process and focused its analysis on three finalist alternatives: 32B and two avoidance alternatives, no-action and 42A. Final Section 4(f) Evaluation, AR, Vol. 10 at 6855-58. The FHWA evaluated the 32B and 42A alternatives based on three general criteria: (1) direct impacts to Section 4(f) properties, (2) cumulative and indirect impacts to Section 4(f) properties and (3) other environmental impacts. Id. at 6863-69. It also considered the mitigation measures associated with the 32B and 42A Alternatives. Id. at 6870-78.

---

[22]    The William Meairs Farmstead consists of an occupied farmstead located on both sides of the Wakarusa River on the west side of E 1400 Road. The farm's main feature is a two-story stucco-covered house, with a sign over the east-facing porch which says "Meairs Farmstead 1854." A concrete well house shed is immediately west of the house, along with a garage and several other out-buildings. The owner has a number of historical documents related to the property, dating back to the Territorial Period. One family has held the farmstead since settlement in 1854, and the house was partially burned by Quantrill's Raiders during their retreat from Lawrence on August 21, 1863. When the present house was built in 1878, the original house was moved to where the garage is now located. The original house was torn down in the 1920s, leaving no standing structures associated with the Territorial Period or the Quantrill Raid. The present house has very thick walls, suggesting stone construction, and is covered with stucco. Final Section 4(f) Evaluation, AR, Vol. 10 at 6852.

The FHWA concluded that the no-action alternative would have no direct impact on Section 4(f)-protected properties.  Id. at 6866.  Leaving the K-10 highway connection to Lawrence city streets would worsen traffic conditions on K-10 Highway and continue to degrade the human environment by increasing traffic congestion, high accident rates, noise and other issues.  Id.  The FHWA therefore eliminated the no-action alternative, which included a comprehensive regional public transit system, because it did not meet the purpose and need for the project.  Id.

### 32B Alternative

The FHWA concluded that the 32B Alternative would have a direct adverse impact on the Haskell Farm because it would cross farm property in the general vicinity of various historic structures, including dikes, canals, roads, bridges and water control gates, and would disrupt the farm's open landscape, id. at 6863, and fill material from the construction would be placed on roughly 48 acres of farm fields (now wetlands).  The FHWA also concluded that the 32B Alternative would have minor cumulative and indirect impacts to the Haskell Farm by diminishing historic open views, though these views are already diminished by second growth trees on the southern half of the HINU campus and a line of trees along the east-west dike at the northern edge of the Baker Wetlands.  Id. at 6863.  It determined that the 32B Alternative would have additional environmental impacts because four residences and four business would have to be relocated; 11 farms would have to be severed; 53 acres of wetlands would be destroyed; six streams would be crossed; 1.2 acres of riparian woodlands and 9.6 acres of upland woods would be affected; and minimal visual impact would occur.  With mitigation, the noise impacts of the 32B Alternative would be less than the noise impacts of the no-action and 42A alternatives.  Id. at 6865.  The FHWA also found that 32B is consistent with future land use plans for

the area.  Id.  The 32B mitigation plan, which the FHWA considered in its analysis, would include

turning roughly 304 acres of farmland adjacent to the Baker Wetlands into wetlands (to replace 58 acres

destroyed by the project); relocating Haskell Avenue roughly 1,000 feet east of its present location and

relocating Louisiana Street roughly 2,500 feet west of its present location; creating a 10,000 square-foot

Wetland and Cultural Educational Center; creating hiking and biking trails as well as camp sites and

parking; and placing 12-foot-high noise walls on both sides of the 32B roadway.  Id. at 6876-78.[23]  The

Corps, the SHPO, KDOT, Baker University, Douglas County, and the Advisory Council on Historic

Preservation and the FHWA memorialized these measures in a Memorandum of Agreement.  Id. at

6878.

### 42A Alternative

The FHWA concluded that the 42A Alternative would have no direct adverse impact on the

Haskell Farm and would have no direct adverse impact on the William Meairs Farmstead Property after

vegetative screening mitigation.  Id. at 6866-67.  Therefore, the FHWA considered 42A an avoidance

alternative.  Id. at 6867.  It did, however, find that the 42A Alternative would have greater long-term

cumulative adverse impacts to the Haskell Farm than the 32B Alternative as a result of increased traffic

along roads adjacent to the Farm (Louisiana Street, Haskell Avenue and 31st Street), reasonably

foreseeable development immediately adjacent to the Haskell Farm and uncertain future financial

stability of a portion of the Baker Wetlands if the 32B Alternative were not selected.  Id.  In addition,

the 42A Alternative would cause three residential and one business relocation, twelve farm severances,

a 1.7-mile-long footprint in the Wakarusa River floodplain, two Wakarusa River crossings, impacts on

---

[23]        In selecting an alternative, 23 C.F.R. § 774.3(c) requires the FHWA to consider
mitigation measures, "including any measures that result in benefits to the property."

5.2 acres of riparian woodland, roughly three acres of wetland impacts outside the Baker Wetlands, eight river crossings and significant noise impacts. Id. at 6867-69. Though 31st Street would remain (with its associated visual impact), and the 42A bridge would be visible from the Baker Wetlands, the 42A Alternative would have no visual impact on the HINU campus. Id. at 6869. It would have a significant visual impact on the rural landscape south of the Wakarusa River. Id. The FHWA considered certain mitigation elements with respect to the 42A Alternative. These included a vegetative screen in front of the William Meairs Farmstead property and creating 80 acres of new wetlands to offset the destruction of 4.45 acres of wetlands. Id. at 6866, 6869.

FHWA's 32B and 42A Comparison

The FHWA selected the 32B Alternative over the 42A Alternative based on seven considerations: (1) 32B would better meet the purpose and need of the project, (2) 42A would cost more than 32B, (3) 42A would have greater impact on the Wakarusa floodplain and floodway, (4) 42A would accelerate planned and unplanned development south of the Wakarusa River, (5) 42A would have greater secondary and cumulative impact than 32B, (6) 42A would have greater environmental impact than 32B, and (7) 32B would provide a net benefit to the Section 4(f) properties through its mitigation package. Id. at 6891-99.

*Purpose and Need*

The purpose and need of the SLT project is to provide a safe, efficient, environmentally sound and cost-effective transportation facility for K-10 Highway users, and, to the extent possible, to alleviate congestion on Lawrence streets. The FHWA concluded that the 32B Alternative meets this purpose and need better than the 42A Alternative because it diverts more traffic from Lawrence city streets, improves safety on those streets and is nearly one mile shorter than 42A. The 32B Alternative would divert as

many as 3,634 more cars per day from city streets and result in 12 fewer accidents per year by 2025.[24] Id.

*Costs*

The FHWA estimated that the 42A Alternative would cost roughly $19 million more than the 32B Alternative due to higher roadway and bridge construction costs. Id. at 6892. This estimate includes mitigation costs of $22.1 million, road construction, bridge construction, utility relocation, preliminary engineering, construction engineering and right of way and displacement costs. Id. Although the 32B Alternative has higher mitigation and road construction costs, bridge construction for the 42A Alternative would cost nearly $50 million more than for 32B. Id. It is unclear how the FHWA determined the $22.1 million cost for the 32B mitigation plan. Its individual mitigation cost tables show that 32B mitigation would cost roughly $200,000 more than its general estimate, and these tables do not account for costs associated with acquiring and converting the 317 acres of new wetlands, moving 31st Street, building the 10,000 square foot Wetland Center, constructing hiking and biking trails, and creating parking and camping areas. See Doc. #48 at 20, 21 n.80, 55-56; FHWA ROD, AR, Vol. 11 at 8023, 8027-35.

*Wakarusa Floodplain and Floodway Impacts*

Both the 32B and the 42A alternative affect the Wakarusa floodplain, but the FHWA found that 32B would impact the floodplain less. Id. The 32B Alternative would be located on the northern edge of the floodplain with two miles of the roadway located in the floodplain; the 42A Alternative would pass through more than two miles of floodplain and cross the Wakarusa River in three places. Id. The

---

[24] The 32B Alternative would reduce the average number of accidents per year by 120 as compared to 108 under 42A. Final Section 4(f) Evaluation, AR, Vol. 10 at 6891.

FHWA relied on the Corps of Engineers' conclusion that the 42 Alternative would "have a significantly greater impact on the river and its riparian corridor," id., and disagreed with Department of Interior Comments that the 42A Alternative would have "less impacts to wetlands, less floodplain impacts, and less total stream involvement (greater number of crossings but fewer total linear feet of involvement)," Draft Section 4(f) Evaluation, AR, Vol. 9 at 6544.

*Development South of Wakarusa River*

The FHWA determined that the 42A Alternative would accelerate planned and unplanned development south of the Wakarusa River, including increased demand for street, sewer, water and other public utility infrastructure, and a new "commercial node" that would attract "a more mixed and dense urban population" than currently planned for that area. Final Section 4(f) Evaluation, AR, Vol. 10 at 6893, 6895. It also determined that the 32B Alternative is more consistent with the city's plans for long-term growth (*Horizon 2020*) and transportation (*Transportation 2025*). Id. at 6895. The FHWA projected that accelerated growth south of the Wakarusa River would increase traffic and attract more dense urban development around the Haskell Farm than presently exists or would exist under the 32B Alternative. Id. at 6895. The 32B Alternative, because of its location north of the Wakarusa River, would not create this pressure to develop currently undeveloped land south of the Wakarusa River. Id. at 6892-93.

*Secondary Cumulative Impacts*

The FHWA concluded that although the 42A Alternative would have no direct impact on the Haskell Farm, it would cause greater long-term secondary and cumulative adverse effects than the 32B Alternative. Specifically, the 42A Alternative would lead to a greater increase in traffic on the streets surrounding the Haskell Farm. See id. at 6895-96. The FHWA determined that by 2025, 700 additional

vehicles per day would travel on the roads surrounding the Haskell Farm. See Table 6, Final Section 4(f) Evaluation, AR, Vol. 10 at 6896. In addition, even though the land adjacent to the Baker Wetlands is located in a 100-year floodplain, it could be developed under 42A. Final Section 4(f) Evaluation, AR, Vol. 10 at 6896. According to the FHWA, this development would diminish or eliminate the rural character of the land surrounding the Haskell Farm and bring with it increased traffic, noise, light, urban debris and visual disturbances. Id. The FHWA also concluded that in 2025, taking into consideration the 32B mitigation plan, noise levels under the 32B Alternative would be less than under the 42A Alternative (though the noise walls may create a visual disturbance until the vegetative screen grows to a height sufficient to block the view of the walls). Id. at 6896-97.

*Adverse Environmental Impacts*

The FHWA's Final Section 4(f) Evaluation stated that the 42A Alternative would impact 5.2 acres of riparian woodlands and 18.2 acres of upland woods, whereas the 32B Alternative would impact 1.2 acres of riparian woodlands and 9.6 acres of upland woods. Id. In addition, it found that the 42A Alternative would be situated along the area where the Oregon and California National Historic Trail was located, along with Blanton's Crossing. Id. The National Park Service has identified Blanton's Crossing as a "High Potential Site" for its importance as a trail resource and its role in western migration and "Bleeding Kansas." Id. The 32B Alternative, the FHWA found, would avoid the William Meairs Farmstead and the area south of the Wakarusa River. Id.

*Net Benefit to Section 4(f) Property*

The FHWA determined that the mitigation measures associated with the 32B Alternative would provide a net benefit to the Haskell Farm that the 42A Alternative would not provide. Id. at 6898. Based on this analysis, the FHWA's Final Section 4(f) Evaluation concluded that when all factors are

taken together, rather than individually, the 42A Alternative would create adverse impacts that present unique problems, and that it therefore is not a feasible and prudent alternative to 32B. Id. at 6899. The FHWA further concluded that its analysis included all possible planning to minimize harm to the Haskell Farm. Id. In its ROD issued May 2, 2008, based on the Corps' FEIS, the FHWA's Section 4(f) Evaluation and careful consideration of all social, economic and environmental factors, as well as public input, the FHWA adopted 32B as the selected alternative for the SLT project. FHWA ROD, AR, Vol. 10 at 7758.

### Plaintiffs' Claims

Plaintiffs advance several challenges to the FHWA's ROD: (1) the FHWA violated NEPA by eliminating an early version of the 42C Alternative during the scoping process, without explanation, by refusing to issue an SEIS that considered the 42C Alternative and by improperly conducting the NEPA noise study; (2) the FHWA's Final Section 4(f) Evaluation improperly concluded that the 42A Alternative was imprudent based on arbitrary and capricious factual findings with respect to purpose and need (traffic and safety), cost, Wakarusa floodplain and floodway impacts, development south of the Wakarusa River, secondary and cumulative impacts on Haskell Farm, environmental impacts and 32B's net benefit; (3) the FHWA arbitrarily and capriciously did not consider the 42C Alternative; and (4) the FHWA's decision to select the 32B Alternative was procedurally flawed because it relied on a legally deficient noise study. For the reasons stated below, the Court affirms the FHWA's ROD.

### Analysis

I.    **NEPA Claim**

Plaintiffs assert that the FHWA violated NEPA by eliminating an early version of the 42C Alternative during the scoping process, without explanation, by refusing to prepare an SEIS that

included the 42C Alternative and by failing to measure existing noise levels and traffic noise impacts in its noise study. Doc. #48 at 56-60; Doc. #62 at 7-9, 17. NEPA requires that federal agencies assess potential environmental consequences of proposed federal action by imposing various "action-forcing" procedural requirements, including the preparation of draft, final and, in some cases, supplemental environmental impact statements. 42 U.S.C. §§ 4321, 4332(2)(C); 40 C.F.R. §§ 1500.3, 1502.1. NEPA does not "mandat[e] that agencies achieve particular substantive environmental results," Marsh v. Or. Natural Res. Council, 490 U.S. 360, 371 (1989), but simply imposes procedural requirements that force agencies to take a "hard look" at the environmental impact of certain agency actions, Morris v. U.S. Nuclear Regulatory Comm'n, 598 F.3d 677, 690 (10th Cir. 2010). See also 40 C.F.R. §§ 1500.3, 1502.1. Accordingly, an agency must prepare a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i); see also 40 C.F.R. Part 1502. The EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives," including "the alternative of no action," and must "briefly discuss" alternatives that were eliminated from detailed study. 40 C.F.R. § 1502.14(a)-(c). Moreover, an FEIS must be supplemented if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." Id. § 1502.10; 23 C.F.R. § 771.130.

In addition, NEPA regulations require that the FHWA "determine and analyze expected traffic noise impacts and alternative noise abatement measures to mitigate these impacts." 23 C.F.R. § 772.9(a). The traffic noise analysis must (1) identify existing activities and lands that may be affected by noise from the highway; (2) predict traffic noise levels; (3) determine existing noise levels; (4) determine traffic noise impacts defined as impacts that occur when predicted traffic noise levels approach or exceed the noise abatement criteria or substantially exceed the existing noise levels;

(5) examine and evaluate alternative noise abatement measures for reducing or eliminating noise impacts. Id. § 772.9(b). NEPA regulations also set noise abatement criteria ("NAC") for five types of land and land use activities. 23 C.F.R. Part 772, Table 1. Each land use or activity is assigned a noise level, which if approached or exceeded, requires the FHWA to consider noise mitigation measures such as constructing noise barriers or acquiring property to create a "buffer zone." 23 C.F.R. §§ 772.5, 772.9, 772.13.

Because NEPA does not provide an independent cause of action, the Court reviews the FEIS as a final agency action under the APA and will set it aside only if it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. 5 U.S.C. §§ 702, 704, 706; Valley Cmty. Pres. Comm'n v. Mineta, 373 F.3d 1078, 1085 (10th Cir. 2004); Davis v. Mineta, 302 F.3d 1104, 1111 (10th Cir. 2002); All Indian Pueblo Council v. United States, 975 F.2d 1437, 1443 (10th Cir. 1992).

### A.    Elimination of Conceptual 42nd Street Alignment

Plaintiffs assert that the FHWA violated 40 C.F.R. § 1502.14(a), a Council on Environmental Quality ("CEQ") regulation, which requires an agency to briefly discuss its reasons for eliminating an alternative from detailed study in an EIS. Doc. #48 at 56. Plaintiffs specifically allege that the FHWA violated the regulation by adopting the Corps' FEIS, which did not explain why the Corps eliminated a conceptual 42nd Street alignment that was similar to plaintiffs' proposed 42C Alternative. Id. The Corps admitted that it considered a conceptual 42nd Street alignment similar to plaintiffs' 42C Alternative, Corps ROD, AR, Vol. 3 at 2541, and that it did not discuss the alignment in its FEIS, Doc. #55 at 23. The Corps stated, however, that it rejected the alignment early in the process because other 42nd Street alignments provided less curvature and were safer, more desirable alternatives. Id. Essentially, the FHWA argues that the conceptual 42nd Street alignment was not a reasonable

alternative, and therefore had no duty to discuss it in the EIS before eliminating it. <u>See</u> Doc. #55 at 23.

The "heart of the environmental impact statement" is an agency's consideration, rigorous exploration and objective evaluation of "all reasonable alternatives." 40 C.F.R. § 1502.14(a). This requires the agency to "briefly discuss" its reasons for eliminating alternatives from detailed study. <u>Id.</u> NEPA does not, however, "require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective." <u>Custer Cnty. Action Ass'n v. Garvey</u>, 256 F.3d 1024, 1040 (10th Cir. 2001) (quoting <u>Colo. Envtl. Coal. v. Dombeck</u>, 185 F.3d 1162, 1174 (10th Cir. 1999)) (internal quotation marks and citations omitted). The Court applies a "rule of reason" to determine whether claimed deficiencies in an FEIS are significant enough to undermine NEPA's purpose of informed decision making. <u>See</u> <u>Fuel Safe Wash. v. Fed. Energy Regulatory Comm'n</u>, 389 F.3d 1313, 1323 (10th Cir. 2004); <u>Ass'ns Working for Aurora's Residential Env't v. Colo. Dep't of Transp.</u>, 153 F.3d 1122, 1130 (10th Cir. 1998). In other words, if the FHWA reasonably and in good faith concluded that the conceptual 42nd Street alignment was too impractical or ineffective with respect to the project's purpose and need, it did not violate NEPA by eliminating the alignment without explanation. The Court may not substitute its judgment for that of the agency, but may only determine whether the agency has followed the necessary procedures. <u>Ass'ns Working for Aurora's Residential Env't</u>, 153 F.3d at 1130.

The Corps considered the conceptual 42nd Street alignment, and 26 others, during its initial review phase. <u>FEIS</u>, <u>AR</u>, Vol. 2 at 2538. During the scoping process, the Corps whittled down the number of alternative alignments from 27 to 12. <u>Id.</u> The Corps' DEIS and FEIS subjected the 12 alignments to additional scrutiny. <u>Id.</u> The Corps initially evaluated the 27 alignments based on KDOT's requirements for a 75-mile-per-hour design speed, impacts to existing roads, safety concerns, route

efficiency, construction and maintenance costs, home displacements, floodway and floodplain impacts, wetland impacts, impacts to properties listed and eligible for listing on the National Register of Historic Places, and other considerations. Id. In light of these criteria, the Corps eliminated the conceptual 42nd Street alignment because it determined that other 42nd Street alignments, specifically 42A and 42B were safer, shorter and more desirable. See id. at 2539; Doc. #55 at 42. In other words, the Corps reasonably eliminated the conceptual alignment because it was impractical or ineffective in light of the project's purpose and need "to provide a safe, efficient, environmentally sound and cost-effective transportation facility for users of K-10 Highway and the surrounding state highway system and, to the extent possible, to alleviate congestion on Lawrence city streets." FEIS, AR, Vol. 2 at 553-54.[25] Therefore, the conceptual 42nd Street alignment was not a "reasonable alternative" the EIS was required to "briefly discuss" before eliminating it. See 40 C.F.R. § 1502.14; Custer Cnty. Action Ass'n, 256 F.3d at 1040. Moreover, the Corps' DEIS and FEIS satisfy NEPA's purpose of "sharply defining the issues" so that the agency can take a "hard look" at the environmental impacts of the project and make a reasoned decision between the various reasonable alternatives. See 40 C.F.R. §§ 1500.1, 1502.14; Custer Cnty. Action Ass'n, 256 F.3d at 1039.[26] For these reasons the Court concludes that the Corps' FEIS, which the FHWA adopted in its Final Section 4(f) Evaluation and Record of Decision, complied with

---

[25]     Plaintiffs do not contend that the elimination of the conceptual 42nd Street alignment was unreasonable. Instead, they essentially assert that any alternatives the Corps considered at any stage of the process, including the conceptual 42nd Street alignment, must "receive the open and fair public review intended by NEPA." Doc. #48 at 57. This, however, is not what NEPA and its implementing regulations require; they require that the elimination of any *reasonable* alternative that is not too impractical or ineffective in light of the project's purpose be "briefly discussed" before it is eliminated. See Custer Cnty. Action Ass'n, 256 F.3d at 1040.

[26]     For a detailed explanation of the Corps' screening process in selecting the 32B Alternative, see FEIS, AR, Vol. 2 at 566-612; FHWA ROD, AR, Vol. 11 at 7737-58.

40 C.F.R. § 1502.14(a) and was not arbitrary, capricious or an abuse of discretion.

## B. Supplemental Environmental Impact Statement

Plaintiffs assert that the FHWA abused its discretion under NEPA by refusing to prepare an SEIS that included the PBPN's proposed 42C Alternative because the substantially lower costs associated with 42C constituted "significant new circumstances or information relevant to environmental concerns and bearing upon the proposed action or its impacts" under 40 C.F.R. § 1502.9(c)(1)(ii). Doc. #48 at 56-57; Doc. #62 at 17. Defendants assert that the FHWA's decision not to supplement the Corps' FEIS to address the PBPN's proposed 42C Alternative was the result of a thorough evaluation of the 42C Alternative and therefore was not arbitrary or capricious. Doc. #55 at 26-29.

An agency is required to prepare an SEIS if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 23 C.F.R. § 771.130(a)(2); 40 C.F.R. § 1502.9(c)(1)(ii). An SEIS is not required "every time new information comes to light." Marsh, 490 U.S. at 373. The Court reviews the FHWA's decision under the arbitrary and capricious standard. Marsh, 490 U.S. at 377; Friends of Marolt Park v. U.S. Dep't of Transp., 382 F.3d 1088, 1096 (10th Cir. 2004). The Court must uphold the FHWA's decision not to prepare an SEIS so long as the record demonstrates that the FHWA reviewed the PBPN's proffered supplemental information, evaluated the significance – or lack of significance – of the new information and provided an explanation for its decision not to supplement the existing analysis. Colo. Envtl. Coal., 185 F.3d at 1178.

The record clearly demonstrates that the Corps, KDOT and the FHWA reviewed the PBPN's proposed 42C Alternative, evaluated its significance and gave the PBPN an explanation of their decision not to supplement the FEIS analysis. Corps ROD, AR, Vol. 3 at 2538-46; FHWA ROD, AR, Vol. 10

at 7441-46. Plaintiffs assert that the 42C Alternative, which the PBPN proposed after the Corps issued its FEIS, constitutes "new circumstances or information" which required an SEIS because 42C would be $10 to $20 million cheaper than the 42A Alignment. Doc. #48 at 58; FEIS, AR, Vol. 3 at 2530.[27] The 42C Alternative, however, was not entirely new. The Corps considered a similar alignment alternative in the scoping stage of the EIS process and properly eliminated the alignment for safety and other reasons. Id. at 2539. This fact alone is sufficient to reject plaintiffs' challenge. See New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 705 (10th Cir. 2009) (when relevant environmental impacts already considered in NEPA process, no supplement required); Friends of Marolt Park, 382 F.3d at 1096-97. Notwithstanding this earlier decision, however, the Corps and KDOT reviewed plaintiffs' proposed alignment and determined that the 42C Alternative, after adjusting the route to avoid public park and school land, and applying the same unit costs and design criteria as applied to the other alternatives, would cost only $5.3 million less than 42A – not $10 to 20 million – and would still be nearly $13 million more than 32B. Id. at 2543. In addition, the record contains no evidence, and plaintiffs do not assert, that 42C would address the adverse environmental consequences associated with 42A. This fact too is sufficient to reject plaintiffs' challenge. See New Mexico ex rel. Richardson, 565 F.3d at 705 (supplement unnecessary when new alternative "qualitatively within the spectrum of alternatives that were discussed in the draft" and is only minor variation from those

---

[27]    Plaintiffs projected dramatic cost savings with the 42C Alternative because this alignment would require much less bridge construction than the 42A Alternative. FEIS, AR, Vol. 3 at 2530. Plaintiffs disparage KDOT's treatment of their 42C Alternative, asserting that KDOT "attempted to sabotage the 42C alternative by intentionally misdesigning it and manufacturing false concerns for it." Doc. #48 at 57-58. The record contains no evidence of intentional sabotage or misdesign. Rather, the 42C design upon which the Corps and KDOT based their response was provided by plaintiffs, with minimal adjustments to avoid public park and school land, which plaintiffs do not dispute. See FEIS, AR, Vol. 3 at 2532, 2539.

alternatives); Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18035 (Mar. 17, 1981). Here, the record satisfied the purpose of NEPA, and the SEIS action-forcing requirement in particular, to ensure that the Corps and the FHWA took a "hard look" at the environmental consequences of its actions. Early in the EIS process, the Corps analyzed and properly eliminated a route similar to the 42C Alternative. Corps ROD, AR, Vol. 3 at 2538-46. The Corps later reviewed plaintiffs' proposed 42C Alternative, id., and based on that review declined to issue an SEIS, see id. at 2540.[28] The FHWA also reviewed the Corps' entire FEIS and, based on this review, declined to issue an SEIS. FHWA ROD, AR, Vol. 10 at 7441-46. The Corps and the FHWA both explained their reasons for declining to issue an SEIS. See id. at 2538-2546; FHWA ROD, AR, Vol. 10 at 7441-46. On this record, the FHWA's decision to not issue an SEIS was not arbitrary or capricious.

C.    Noise Study

Plaintiffs assert that the FHWA violated NEPA noise study regulations by not measuring existing noise levels and determining the impact of traffic noise increases (*i.e.*, not comparing predicted noise levels to existing levels). Doc. #48 at 42-43; Doc. #62 at 5-9.[29] NEPA regulations require that the

---

[28]    Plaintiffs direct their SEIS claim exclusively at the FHWA, and not the Corps, but plaintiffs first asked the Corps to reconsider its FEIS in light of the proposed 42C Alternative. The communications between plaintiffs and the Corps provide a full picture of the review plaintiffs' 42C Alternative received, even though these communications are not framed in SEIS terms. See Corps ROD, AR, Vol. 3 at 2538-40.

[29]    Plaintiffs attack the noise contour maps for the same reason. The noise contour maps do not purport to show the noise increase impacts, however, but merely mark the predicted noise impacts for each alternative (*i.e.*, at what geographic point does the noise dissipate to below 56 dBA). Therefore the noise maps are not legally deficient even if the FHWA did not compare existing and future noise levels. Plaintiffs' other noise study and noise map arguments pertain to the FHWA's Section 4(f) Evaluation and, as such, are discussed below. See infra Part II.A.5.

FHWA "determine and analyze expected traffic noise impacts and alternative noise abatement measures to mitigate these impacts." 23 C.F.R. § 772.9(a). Among other things, the FHWA traffic noise analysis must include a "[d]etermination of existing noise levels," 23 C.F.R. § 772.9(b)(3), and a "[d]etermination of traffic noise impacts" for each alternative under detailed study, 23 C.F.R. § 772.9(b)(4). Traffic noise impacts occur when predicted traffic noise levels approach or exceed the noise abatement criteria ("NAC") or when they substantially exceed existing noise levels. 23 C.F.R. § 772.11 (g).[30] The purpose of the noise study regulation is to force agencies to determine

---

[30] The NAC set forth in the NEPA noise study regulations provide acceptable noise levels for five land uses. 23 C.F.R. Part 772, Table 1 (reproduced below). For example, the acceptable noise level on developed land is higher than the acceptable level for land on which serenity and quiet are valued, and undeveloped lands have no NAC. The purpose of the NAC is to trigger an abatement analysis: if noise levels approach or exceed the NAC, the agency must consider abatement measures. 23 C.F.R. § 772.11(c). Because undeveloped lands have no NAC, abatement is never required unless certain "sensitive receivers," such as residences, are impacted. See Final Section 4(f) Evaluation, AR, Vol. 10 at 6888.

### TABLE 1 TO PART 772—NOISE ABATEMENT CRITERIA
(Hourly A-Weighted Sound Level—decibels (dBA)[1]

| Activity Category | Leq(h) | $L_{10}$(h) | Description of activity category |
|---|---|---|---|
| A ............................... | 57 (Exterior) ...... | 60 (Exterior) ..... | Lands on which serenity and quiet are of extraordinary significance and serve an important public need and where the preservation of those qualities is essential if the area is to continue to serve its intended purpose. |
| B ............................... | 67 (Exterior) ...... | 70 (Exterior) ..... | Picnic areas, recreation areas, playgrounds, active sports areas, parks, residences, motels, hotels, schools, churches, libraries, and hospitals. |
| C ............................... | 72 (Exterior) ...... | 75 (Exterior) ..... | Developed lands, properties, or activities not included in Categories A or B above. |
| D ............................... | ............................. | ............................. | Undeveloped lands. |
| E ............................... | 52 (Interior) ....... | 55 (Interior) ...... | Residences, motels, hotels, public meeting rooms, schools, churches, libraries, hospitals, and auditoriums. |

[1] Either $L_{10}$(h) or Leq(h) (but not both) may be used on a project.

whether an alternative under study requires noise abatement measures (*e.g.*, construction of noise barriers or acquisition of property to create a buffer zone).  23 C.F.R. §§ 772.11(c), 772.13(c).

Plaintiffs base their argument primarily on a statement in the Revised Preliminary South Lawrence Trafficway Traffic Noise Analysis Summary that reads as follows:

> Due to the conceptual nature of this project, the predicted noise levels were not compared to the existing noise levels.  However, when an alignment is selected these noise levels will be compared and any additional impacts will be identified.

FEIS, AR, Vol. 2 at 894; Doc. #48 at 42-43.  The FHWA asserts that, notwithstanding this statement, the study included existing noise levels and that it properly analyzed those measurements to conclude that the 42A Alternative would have greater noise impacts on the Haskell Farm than the 32B Alternative.    The document on which plaintiffs rely is a traffic noise analysis prepared by URS, a Corps of Engineers contractor.  See FEIS, AR, Vol. 2 at 890.  Contrary to plaintiffs' assertion, the noise study contains existing noise level measurements.  FEIS, AR, Vol. 2 at 894, 904-05; Final Section 4(f) Evaluation, AR, Vol. 10 at 6864.[31]  The question, then, is whether the Corps in its FEIS or the FHWA

---

[31]    The noise study states:
Noise measurements were taken during September 2001 at thirteen potentially impacted or sensitive locations in the study area for the SLT. These measurements were recorded on warm, dry, calm, weekdays using a Quest 2900 integrating/logging level meter. Field data collection included the type of vehicle, operating speeds and existing noise level information.
FEIS, AR, Vol. 2 at 894-95.

The FHWA's Final Section 4(f) Evaluation states:
A traffic noise analysis was completed for the proposed SLT alternatives. The noise analysis was performed in accordance with FHWA and KDOT policies using the Traffic Noise Model.  Existing noise levels were measured in the field. Noise measurements were taken during September 2001 at 13 locations identified as noise sensitive areas or as areas having a potential to be impacted by the proposed project. Measurements were taken on warm, dry, and calm weekdays using a Quest 2900 integrating/logging level meter.

(continued...)

-34-

in its Section 4(f) Evaluation satisfied NEPA requirements by comparing the noise increase impacts of the 32B and 42A alternatives, even though the initial report did not.[32]

The FHWA's Final Section 4(f) Evaluation stated that under the NAC, acceptable noise levels for the 32B project area range from 67 dBA (Category B) to 72 dBA (Category C) and that existing noise levels ranged from 51.1 dBA to 64.1 dBA. Final Section 4(f) Evaluation, AR, Vol. 10 at 6864.[33] The FHWA concluded that without noise walls the 32B Alternative would have "a significant impact on adjacent noise-sensitive areas (HINU south campus, Baker Wetlands)," Final Section 4(f) Evaluation, AR, Vol. 10 at 6888, and that the 42A Alternative would have no direct noise impact, see id. at 6867. With the proposed mitigation plan, however, the FHWA concluded that due to increased traffic around the Haskell Farm, the indirect audible disturbances on Section 4(f)-protected property would exceed the direct 32B noise impacts. Final Section 4(f) Evaluation, AR, Vol. 10 at 6865. The FHWA also concluded that 42A would have noise impacts on certain sensitive receivers (residences) within the undeveloped area south of the Wakarusa River, which would require noise abatement. Final Section 4(f) Evaluation, AR, Vol. 10 at 6888. At oral argument the FHWA asserted that it had complied with the noise study regulation because its Section 4(f) evaluation considered the "increase over existing"

---

[31](...continued)
Final Section 4(f) Evaluation, AR, Vol. 10 at 6864.

[32]     Although the URS report did not compare existing and future noise impacts for the 32B and 42A alternatives, the report attached data tables that did so. See FEIS, AR, Vol. 2 at 902-05; FHWA ROD, AR, Vol. 11 at 8051-54.

[33]     The FHWA emphasizes that the NAC are not noise level requirements, but rather threshold noise levels that if approached or exceeded trigger abatement requirements. Doc. #55 at 18. The FHWA stated in its Final Section 4(f) Evaluation, as well as its brief, that the NAC "are EXISTING noise levels." Final Section 4(f) Evaluation, AR, Vol. 10 at 6888; Doc. #55 at 18. The FHWA, however, is mistaken. The NAC levels are taken straight from 23 C.F.R. Part 772 and the Final Section 4(f) Evaluation itself clearly states (in a different section) that existing noise levels were different than the NAC. See Final Section 4(f) Evaluation, AR, Vol. 10 at 6864.

-35-

data contained in the URS charts. The administrative record, however, contains no evidence of this. Rather, the record indicates that the FHWA reached general conclusions regarding traffic noise impacts and focused on comparing estimated future noise levels associated with the 32B and 42A alternatives. Based on this comparison the FHWA concluded that after mitigation the 32B Alternative produced fewer audible disturbances than the 42A Alternative. See Final Section 4(f) Evaluation, AR, Vol. 10 at 6864-69, 6887-89. By not comparing existing noise levels with the NAC or with predicted future noise levels for each alternative, the FHWA did not comply with the noise study requirements contained in 23 C.F.R. Part 772. Its decision to select the 32B Alternative should therefore be reversed and remanded if reliance on the defective noise study constitutes prejudicial error.

Judicial review under the APA requires the Court to take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. In other words, FHWA errors require reversal only if plaintiffs can show prejudice from the errors. New Mexico ex rel. Richardson, 565 F.3d at 708 (citing Bar MK Ranches v. Yuetter, 994 F.2d 735, 740 (10th Cir. 1993)). The Court applies a "rule of reason" to determine whether the FHWA's failure to determine traffic noise impacts for the 32B and 42A alternatives is merely a "flyspeck" or whether it is significant enough to defeat the goals of informed decision-making and informed public comment. New Mexico ex rel. Richardson, 565 F.3d at 704. NEPA's action-forcing procedural requirements were not intended "to generate paperwork – even excellent paperwork – but to foster excellent action" by ensuring that "officials make decisions that are based on understanding of environmental consequences," enabling them to "take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c); see also Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 768-69 (2004). The noise study regulations, in particular, were intended to "provide procedures for noise studies and noise abatement measures to help protect the public health and welfare"

and to "supply noise abatement criteria." 23 C.F.R. § 772.1. Here, plaintiffs can show prejudice only if the FHWA would have rejected the 32B Alternative but for this error. The procedural error which plaintiffs cite does not rise to this level.

NEPA's central purpose is to ensure that informed decisions are made with respect to the environmental impacts of major federal actions. 40 C.F.R. § 1500.1(c); Pub. Citizen, 541 U.S. at 768-69; Forest Guardians v. U.S. Fish & Wildlife Serv., 611 F.3d 692, 717 (10th Cir. 2010). Consistent with NEPA's purpose, the relevant question for the FHWA was the future noise level each alternative would generate. After comparing the projected noise levels of both alternatives, the FHWA concluded that 32B would produce fewer noise impacts in the future. Therefore, it selected 32B as the preferred alternative with respect to projected audible disturbances. Plaintiffs do not allege, and the record does not reflect, that a noise impact analysis which compared existing noise levels to future noise levels for 32B and 42A, to determine whether mitigation measures were necessary, would have changed the outcome.[34] Therefore, plaintiffs have not demonstrated that the FHWA's non-compliance with 23 C.F.R. Part 772 would justify reversing and remanding the FHWA's ROD.

## II.    Section 4(f) Claims

Section 4(f) of the Department of Transportation Act limits the authority of the Secretary of Transportation to approve federally-funded transportation projects that use land of historic significance. 49 U.S.C. § 303(c). Through the FHWA, the Secretary may only approve a project that affects Section

---

[34]    Plaintiffs allege that the FHWA committed a strictly procedural error; they do not allege prejudice. Plaintiffs do not assert that with mitigation, the 32B Alternative would approach or exceed the NAC, nor do they assert that the 42A Alternative was unfairly rejected because the FHWA did not consider measures to mitigate the 42A noise levels on streets surrounding the Haskell Farm. Indeed, at oral argument plaintiffs conceded that mitigation measures were not required for the 42A Alterative because it was located in undeveloped (NAC Category D) land.

4(f)-protected land if "(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the . . . historic site resulting from the use." 49 U.S.C. § 303(c); 23 C.F.R. §§ 774.17, 774.3.[35]  The FHWA's Final Section 4(f) Evaluation identified two Section 4(f)-protected properties: the William Meairs Farmstead and the Haskell Farm. Final Section 4(f) Evaluation, AR, Vol. 10 at 6842. The Haskell Farm is the only Section 4(f) property which is affected by the 32B Alternative.  See Final Section 4(f) Evaluation, AR, Vol. 10 at 6855-57. The FHWA's decision to approve the 32B Alternative is reviewable under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 702, 704, 706.

The United States Supreme Court's decision in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971), laid out a three-part inquiry that guides the Court's analysis of plaintiffs' Section 4(f) claims.  See Comm. to Pres. Boomer Lake Park v. Dep't of Transp., 4 F.3d 1543, 1549 (10th Cir. 1993).  First, the Court must consider whether the FHWA properly construed its duty to avoid the Haskell Farm property unless feasible and prudent alternatives do not exist, or feasible alternatives involve uniquely difficult problems. Overton Park, 401 U.S. at 416.  To affirm the FHWA decision, this Court must find that the FHWA could have reasonably believed that no feasible and prudent avoidance alternative alternatives exist or that the alternatives involve unique problems of extraordinary magnitude. Id.; 23 C.F.R. § 774.17.  Second, the Court must determine that the FHWA decision was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Id.; 5 U.S.C. § 706(2)(A).  In other words, the FHWA decision must be based on a "consideration of the relevant factors" and not on "a clear error of judgment." Id.  Although this inquiry into the facts is to be

---

[35]    Plaintiffs do not allege that the FHWA Section 4(f) Evaluation did not include all possible planning to minimize harm, but instead focus their claims on whether the 42A Alternative was prudent.  The Court, therefore, does not address the Section 4(f)(2) all possible planning requirement.

searching and careful, the ultimate standard of review is a narrow one.  Id.  If the Court is satisfied that the FHWA took a "hard look" at the relevant factors, the Court may not substitute its judgment for that of the agency.  Davis v. Mineta, 302 F.3d 1104, 1114 (10th Cir. 2002); see also Overton Park, 401 U.S. at 416.  Third, the Court must determine "whether the Secretary's action followed the necessary procedural requirements."  Id. at 417.

Plaintiffs' challenges to the FHWA factual findings fall into the first and second steps of the Overton Park inquiry.  See Boomer Lake, 4 F.3d at 1553.  Plaintiffs' claim that the FHWA should have considered the 42C Alternative falls under Overton Park step two.  Plaintiffs' contention that the FHWA's Final Section 4(f) Evaluation is undermined by its reliance on a legally deficient noise study falls into step three.  The Court will address each in turn.

### A.     Disputed Factual Findings: Overton Park Steps One and Two

In selecting the 32B Alternative, the FHWA concluded that the 42A Alternative was imprudent because it presented "unique problems."  Final Section 4(f) Evaluation, Vol. 10 at 6899.  Plaintiffs assert that, in doing so, the FHWA applied the wrong legal standard to the 42nd Street Alternative.  Doc. #48 at 34.  The FHWA argues that by considering the cumulative weight of the strengths and weaknesses of the two alternatives, it properly determined that the 42A Alternative was imprudent.  Doc. #55 at 37-38.  Under Overton Park, the question is whether the FHWA could have reasonably believed that the 42A Alternative involved unique problems of extraordinary magnitude that made it imprudent.  Overton Park, 401 U.S. at 412, 416; Boomer Lake, 4 F.3d at 1549-50; see also 23 C.F.R. § 774.17.[36]

---

[36]     Under Section 4(f), the FHWA may select the 32B Alternative (which affects the Haskell Farm) over the 42A Alternative (which avoids the Haskell Farm) only if  there is no prudent and feasible alternative to 32B.  49 U.S.C. § 303.  No feasible alternative exists if "as a matter of sound engineering it would not be feasible to build the highway along any other route."  Boomer Lake, 4 F.3d
(continued...)

Determining whether an alternative is prudent requires a "common sense balancing of practical concerns," <u>Boomer Lake</u>, 4 F.3d 1550, which may include cost, social, economic and environmental impacts or community disruption, 23 C.F.R. § 774.17. An alternative is not prudent if it fails to meet the purpose and need of the project, poses unacceptable safety or operational problems, causes severe environmental impacts, severely disrupts established communities, causes severe impacts to environmental resources protected under federal statutes, results in extraordinary costs or causes other unique problems or unusual factors. <u>Id.</u> The FHWA may consider the cumulative impact of these factors that individually may be minor, but together cause unique problems or impacts of extraordinary magnitude. <u>Id.</u>; <u>Boomer Lake</u>, 4 F.3d at 1550.

The facts and arguments in this case are very similar to those which the Tenth Circuit considered in <u>Boomer Lake</u>. In that case, plaintiffs challenged the FHWA's decision to provide federal funds to build a four-lane highway through a city park. <u>Boomer Lake</u>, 4 F.3d at 1547. Plaintiffs asserted that the FHWA erred in selecting the alternative which cut straight through the protected park because an alternative that avoided the park was both feasible and prudent. <u>Id.</u> at 1549-50. The Tenth Circuit affirmed the FHWA conclusion that the avoidance alternative was imprudent because it did not satisfactorily fulfill the project purpose and need of the project, would cause higher road user costs and more traffic congestion, used substandard curves that created safety concerns, and required greater intersection modifications, greater commercial and residential relocations and higher construction costs.

---

[36](...continued)
at 1549; <u>see also</u> 23 C.F.R. § 774.17. Although the FHWA and KDOT state that the 42A Alternative is not feasible, neither party provides any support for its conclusion. <u>See</u> Doc. #55 at 48; Doc. #54 at 2. Nor does the record reveal any engineering issues that would render the 42A Alternative infeasible. Therefore the Court limits its discussion to whether the FHWA could have reasonably determined that the 42A Alternative was imprudent under Section 4(f).

Id. at 1550.  The Tenth Circuit also considered benefits that the selected alternative would provide, including better fishing access, improved water quality, and a connection between the east and west sides of the park.  Id.  It held that because the avoidance alternative did not adequately meet the purpose and need of the project and posed safety and cost concerns, the cumulative weight of the factors considered was sufficient to support the FHWA's decision even though none of them alone would have been sufficient.  Id.

Here, plaintiffs dispute the degree of certain impacts which the FHWA relied upon in reaching its conclusion that the 42A Alternative is imprudent.  Plaintiffs assert that, even when taken together, the problems posed by 42A do not reach "extraordinary magnitudes."  Doc. #48 at 34.[37]  The FHWA Final Section 4(f) Evaluation concluded that the 42A Alternative was imprudent based on the cumulative impact of seven factors: (1) 32B better met the purpose and need of the project, (2) 42A cost more, (3) 42A had greater impact on the Wakarusa floodplain and floodway, (4) 42A would accelerate planned and unplanned development south of the Wakarusa River, (5) 42A would have greater secondary and cumulative impact on the Haskell Farm, (6) 42A has greater environmental impact, and (7) 32B would provide a net benefit to the Section 4(f) properties through its mitigation package.  Final Section 4(f) Evaluation, AR, Vol. 10 at 6891-99.  Plaintiffs attack each of these factual determinations and assert that the FHWA Section 4(f) process was arbitrary and capricious as a whole because the FHWA skewed its findings to favor 32B.

The Court reviews the challenged findings to determine whether they are arbitrary, capricious,

---

[37]      Plaintiffs also assert that the FHWA improperly construed its authority because it did not explicitly state that the problems associated with the 42nd Street Alternative reach "extraordinary magnitudes," but only that 42A posed "unique problems."  Doc. #48 at 34.  The FHWA need not use the magic words "unique" or "extraordinary;" the "mechanical use of such language in the supporting documents is unrelated to the documents' substantive merit."  Boomer Lake, 4 F.3d 1550-51.

an abuse of discretion, contrary to law or constitute clear error of judgment. The Court must then determine whether the FHWA could have reasonably concluded that the 42A Alternative was imprudent based on findings that survive plaintiffs' challenge.

1.      Purpose and Need: Traffic and Safety

The FHWA concedes that both the 32B and 42A alternatives meet the purpose and need of the SLT, but concluded that the 32B Alternative better met the purpose and need by diverting more traffic from local streets and improving safety on the local street network. Final Section 4(f) Evaluation, AR, Vol. 10 at 6891. Specifically, the FHWA concluded that by the year 2025 the 32B Alternative could carry as many as 3,634 more cars per day and result in twelve less accidents per year than the 42A Alternative. Id.; see also Doc. #55 at 39-41. Plaintiffs assert that the traffic diversion projection is flawed and offer an alternative traffic forecast which shows 42A diverting 9,300 more cars off city streets than 32B. Doc. #48 at 35-36.[38] The Court, however, is not equipped to referee the parties' disagreement over the appropriate methodology to project city traffic reductions; it is not a "super professional transportation analyst" capable of determining the proper traffic planning technique.

---

[38]      Plaintiffs base this argument on a traffic diversion calculation contained in Exhibit 5 attached to Plaintiffs' Opening Brief (Doc. #48). Defendants move to strike Exhibit 5 because (with certain narrow exceptions) the Court's review of administrative actions under the APA is limited to the four corners of the administrative record as developed by the agency, "not some new record made initially in the reviewing court" Doc. #53; Forest Guardians, 579 F.3d at 1131 (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)); see also Fla. Power & Light v. Lorion, 470 U.S. 729, 743-44 (1985) (listing limited exceptions); Citizens for Alts. to Radioactive Dumping v. U.S. Dep't of Energy, 485 F.3d 1091, 1096 (10th Cir. 2007). Plaintiffs do not contend that Plaintiffs' Exhibit 5 falls into one of the recognized exceptions to this rule, but instead argue that Exhibit 5 is a "pedagogical device" used as argument, not evidence. Doc. #58 at 3-4. Although plaintiffs use traffic data contained in the record, their methodology for determining the number of cars diverted from city streets onto the bypass does not appear in the record. See Doc. #53. Because Exhibit 5 contains no new information and plaintiffs do not ask the Court to supplement the record with their city traffic reductions table, the Court treats Exhibit 5 as argument, not evidence, and overrules defendants' motion to strike it.

-42-

N. Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1544 (11th Cir. 1990) (district court could not be expected to determine proper traffic planning technique); Druid Hills Ass'n v. Fed. Highway Admin., 772 F.2d 700, 711 (11th Cir. 1985) (court not equipped to decide which party used better methodology in conducting traffic analysis); see also Boomer Lake, 4 F.3d at 1553 (courts not in position to decide propriety of competing transportation analysis methodologies). Instead, the Court may only determine whether the FHWA's method for predicting future traffic volume has a rational basis, which it does. Boomer Lake, 4 F.3d at 1553. The traffic forecast is based on the Corps' FEIS, which projected average daily traffic volumes based on the Lawrence Area Origin and Destination Study, the South Lawrence Trafficway Truck Percentage Estimation, QRS II Travel Demand Model, previous forecasts and state traffic flow maps, among other sources. FEIS, AR, Vol. 2 at 906. Traffic projections require a high level of technical expertise; they are therefore properly left to the informed discretion of the FHWA. Valley Cmty. Pres. Comm'n v. Mineta, 373 F.3d 1073, 1091 (10th Cir. 2004). Because the FHWA's traffic forecasting methodology does not appear to be arbitrary or capricious, the Court defers to its projection that 32B would divert 3,634 more cars from city streets than 42A. Id. Plaintiffs do not challenge the FHWA's finding that the 32B Alternative has a higher vehicle-per-day capacity than 42A.

Plaintiffs also assert that the FHWA did not properly apply its freeway safety standard, but instead "considered minor differences in accident rates for which there is no support in the record." Doc. #48 at 38. Unsubstantiated determinations can be fatal for a Section 4(f) evaluation, Boomer Lake, 4 F.3d at 1553, but the Final Section 4(f) Evaluation's traffic accident estimates are not unsubstantiated. They are based on the Corps' FEIS, AR, Vol. 10 at 6891, which based its findings on KDOT's traffic

study, <u>AR</u>, Vol. 2 at 594.[39] Although the FHWA predicts that the 32B Alternative will reduce traffic accidents by only 12 more than the 42A Alternative, <u>FEIS</u>, <u>AR</u>, Vol. 2 at 553-54, enhancing safety – even if only slightly – is a relevant factor in determining whether the 42A Alternative is prudent. <u>See</u> <u>Boomer Lake</u>, 4 F.3d at 1550.

Plaintiffs argue that the FHWA improperly disfavored the 42A Alternative for being nearly one mile longer than the 32B Alternative because the difference is relatively minor and is necessary to avoid the Section 4(f)-protected properties. Doc. #48 at 36. Although the availability of a shorter, more direct route is not alone sufficient to overcome the paramount importance of protecting Section 4(f) property, it may, with other factors, render the avoidance alternative imprudent. <u>See</u> <u>Overton Park</u>, 401 U.S. at 411-12; <u>Boomer Lake</u>, 4 F.3d at 1550. Because the FHWA's conclusions with respect to each of these factors were neither arbitrary nor capricious nor a clear error of judgment, it properly considered greater city traffic reductions, higher vehicle-per-day capacity, lower accident rates and the availability of a shorter route under the 32B Alternative as factors in determining whether the 42A Alternative was imprudent.

2.      Cost

The FHWA concluded that the 32B Alternative would cost approximately $19 million less than the 42A Alternative. <u>Final Section 4(f) Evaluation</u>, <u>AR</u>, Vol. 10 at 6892.[40] Plaintiffs contend that the

---

[39]      Plaintiffs do not assert any specific challenge to the FHWA's methodology in generating its traffic accident estimates. They only offer general allegations without support, which is insufficient to overcome the deference the Court must pay to reasonable agency conclusions, particularly technical conclusions.

[40]      The FHWA's 2007 Cost Estimate table appeared in the Final Section 4(f) Evaluation as follows:

(continued...)

FHWA understated the 32B Alternative costs by omitting certain mitigation costs. Doc. #48 at 55-56.

The FHWA states that its Final Section 4(f) Evaluation clearly includes mitigation costs for both the

32B and 42A alternatives. Id. at 6892. It estimated that mitigation costs would be $22.1 million for the

32B Alternative and $2.0 million for the 42A Alternative. Id. Even including the $20.1 million

difference in mitigation costs, the FHWA estimated that 32B would cost $19 million less than 42A,

primarily because 42A bridge construction would cost nearly $50 million more than 32B bridge

construction. Id. Plaintiffs assert that the $22.1 million which the FHWA included for 32B mitigation

costs understates the estimated total bill for the 32B mitigation plan by $10 million because it did not

include all the costs associated with acquiring and converting the 317 acres of new wetlands, building

the 10,000 square foot Wetland and Cultural Center, constructing hiking and biking trails, creating

parking and camping areas, and funding the Baker University annuity. Doc. #48 at 20, 21 n.80, 55-56.

Without support, the FHWA states that all mitigation costs are accounted for in the $22.1 million.

[40](...continued)

**Table 5 – 2007 Cost Estimate**

| Cost Item (Dollars in Millions) | Preferred Alternative (32B) | Avoidance Alternative (42A) |
|---|---|---|
| Mitigation | 22.1 | 2.0 |
| Road Construction | 56.2 | 43.4 |
| Bridge Construction | 35.9 | 82.6 |
| Utility Relocation | 0.8 | 0.6 |
| Preliminary Engineering | 11.4 | 12.8 |
| Construction Engineering | 9.1 | 10.2 |
| Right of Way & Displacement | 12.4 | 15.3 |
| **Total Project** | **147.9** | **166.9** |
| Operation and Maintenance | 0.213 | 0.246 |

Doc. #55 at 40 n.11. This claim, however, is incorrect. According to the FHWA's own numbers, the $22.1 million understates the 32B mitigation costs by nearly $200,000. Further, the FHWA's own numbers do not include several big ticket items – 317 acres of new wetlands, moving 31st Street, building the Wetland and Cultural Center and constructing hiking and biking trails and parking. See Doc. #48 at 20, 21 n.80, 55-56; FHWA ROD, AR, Vol. 11 at 8023, 8027-35. The FHWA cost estimate is therefore clearly erroneous and may not be properly considered in determining that the 42A Alternative is imprudent.[41]

3.      Wakarusa Floodplain and Floodway Impacts

The FHWA's Final Section 4(f) Evaluation conceded that both alternatives would affect the Wakarusa floodplain, but concluded that 32B would affect the floodplain and floodway less than 42A. Final Section 4(f) Evaluation, AR, Vol. 10 at 6892. Plaintiffs assert that the FHWA's own regulations, comments by FHWA headquarters and Department of the Interior ("DOI") opinions undermine the

---

[41]      If the Court accepts plaintiffs' rough estimate that the omitted costs are roughly $10 million, the total cost of the 32B Alternative would be $157.9 million, which is still $9 million less than the 42A Alternative. The FHWA argues that even if its cost calculation is wrong, project cost may nevertheless be considered because even under plaintiffs' cost calculation 32B is $9 million cheaper than 42A. Doc. #55 at 40. The difference in cost can be properly weighed, however, only if the amount of the difference is known. It is not enough to assert that 42A would be more expensive anyway. In light of its failure to include substantial costs, the FHWA cost estimate is so unreliable that it should not be used as a factor in determining whether the 42A Alternative is imprudent.

Plaintiffs also argue that the FHWA erred by not evaluating the 32B Alternative against the 42C Alternative, which would be cheaper than the 42A Alternative. This argument is moot because the FHWA cost estimate will not be considered in the Court's review of whether the FHWA reasonably concluded that the 42A Alternative was imprudent.

When an agency relies on a number of findings, one or more of which are erroneous, the Court must reverse and remand only when there is a significant chance that but for the errors the agency might have reached a different result. Nat'l Parks & Conservation Ass'n v. Fed. Aviation Admin., 998 F.2d 1523, 1533 (10th Cir. 1993) (quoting Salt River Project Agric. Improvement & Power Dist. v. United States, 762 F.2d 1053, 1060-61 n.8 (D.C. Cir. 1985)). Whether the FHWA's reliance on its erroneous cost estimate constitutes prejudicial error that would require reversal and remand its decision is discussed below.

FHWA conclusion. Doc. #48 at 52-53. FHWA headquarters' comments on the Draft Section 4(f) Evaluation and the Corps' FEIS stated that under FHWA regulations "longitudinal encroachments" like the 32B Alternative should be avoided when practicable and that the Section 4(f) ROD should contain a statement regarding floodplain encroachment. Draft Section 4(f) Evaluation, AR, Vol. 8 at 5856. Neither the regulation nor the FHWA headquarters' comments undermine the FHWA's conclusion that the Section 32B Alternative has fewer floodplain and floodway impacts.[42]

The DOI commented that the 42A Alternative "has less impacts to wetlands, less floodplain impacts, and less total stream involvement (greater number of crossings but fewer total linear feet of involvement)." Draft Section 4(f) Evaluation, AR, Vol. 9 at 6544. A reviewing court "may properly be skeptical" that agency conclusions are reliable if the agency "has apparently ignored the conflicting views of other agencies having pertinent expertise." Davis, 302 F.3d at 1123 (quoting Sierra Club v. U.S. Army Corps of Eng'rs, 701 F.2d 1011, 1030 (2d Cir. 1983)) (internal quotation marks omitted). The Court is indeed skeptical, but it is in no position to choose between the conflicting opinions of the FHWA and DOI regarding floodplain and floodway impacts. See Boomer Lake, 4 F.3d at 1553; N. Buckhead Civic Ass'n, 903 F.2d at 1544. The Court may only determine whether the FHWA's conclusion had a rational basis. Boomer Lake, 4 F.3d at 1553. Here, the FHWA stated that the 42A Alternative would pass through roughly 2.4 miles of floodplain, cross the Wakarusa River floodway in three places, and "have a significantly greater impact on the river and its riparian corridor." Final Section 4(f) Evaluation, AR, Vol. 10 at 6892 (quoting Corps' ROD). The 32B Alternative, however,

---

[42]    The regulation does not require the FHWA to avoid longitudinal encroachments in every circumstance, but only where practicable. By selecting 32B over 42A, the FHWA, in essence, concluded that avoiding 32B's longitudinal encroachment was not practical. In addition, the FHWA headquarters simply suggested that the FHWA include a statement regarding floodplain encroachment, and the FHWA included one. See Final Section 4(f) Evaluation, AR, Vol. 10 at 6892.

would lie along the northern edge of the Wakarusa floodplain and cross two miles of it; it would not cross the Wakarusa River and would therefore avoid impacting the Wakarusa River floodway. Id. Notwithstanding the DOI's disagreement, the FHWA's conclusion that the 42A Alternative would have a greater impact on the Wakarusa floodplain and floodway is not arbitrary, capricious or clearly erroneous. The FHWA properly considered its conclusion in rejecting the 42A Alternative as imprudent.

4.     Accelerated Planned and Unplanned Development South of Wakarusa River

The FHWA concluded that the 42A Alternative would accelerate planned and unplanned development south of the Wakarusa River (including increased demand for street, sewer, water and other public utility infrastructure) and a new "commercial node" that would attract "a more mixed and dense urban population" than currently planned for that area. Final Section 4(f) Evaluation, AR, Vol 10 at 6893, 6895. It also determined that the 32B Alternative was more consistent with the city's long-term plans for growth (*Horizon 2020*) and transportation (*Transportation 2025*). Id. at 6895. The FHWA projected that accelerated growth south of the Wakarusa River would increase traffic and attract more dense urban development around the Haskell Farm than presently exists or would exist under the 32B Alternative (see infra Part II.B.5 for detailed discussion). Id. at 6895. Plaintiffs assert that because development would be constrained by local zoning laws, the FHWA forecast for development south of the Wakarusa River is "sheer speculation." Doc. #48 at 51. Plaintiffs cite DOI comments on the FHWA's Draft Section 4(f) Evaluation in which the DOI notes that the area south of the Haskell campus and north of the Wakarusa River (the area around the 32B Alternative) is subject to the same development pressure as areas south of the river. Draft Section 4(f) Evaluation, AR, Vol. 9 at 6543. In its Final Section 4(f) Evaluation, the FHWA acknowledges that development could occur around the

32B Alternative, but states that such development would be more limited than the south-of-the-river development associated with the 42A Alternative because the land north of the river is located in a 100-year floodplain. Id. at 6895. The FHWA noted that although development in the floodplain is permissible if it complies with the local floodplain regulations, it is not recommended for urban development. Id. In addition, the FHWA concluded that the new wetlands created by the 32B mitigation plan would create a buffer between the Haskell Farm and any new development. Final Section 4(f) Evaluation, AR, Vol. 10 at 6868.

The FHWA's conclusion that the 42A Alternative would accelerate planned and unplanned development south of the Wakarusa River is not arbitrary or capricious, nor is it a clear error of judgment; it was therefore an appropriate factor to consider in determining whether 42A is imprudent.

5. Secondary and Cumulative Impacts on Haskell Farm

The FHWA's Final Section 4(f) Evaluation concluded that even though the 42A Alternative would have no direct impact on the Haskell Farm, it would cause greater long-term secondary and cumulative adverse impacts than the 32B Alternative. Final Section 4(f) Evaluation, AR, Vol. 10 at 6895. This conclusion is primarily rooted in the FHWA's determination that 42A would increase traffic on the streets surrounding the Haskell Farm, which in turn would increase noise, light, urban debris and visual disturbances. Id. at 6895-96. The FHWA also predicted that the 42A Alternative would cause increased development in the floodplain adjacent to the Haskell Farm and require one or more of the streets to be expanded. Id. at 6896. It acknowledged that "urban development in the floodplain is not recommended," but noted that such "development may be approved it if complies with the local floodplain regulations." Final Section 4(f) Evaluation, AR, Vol. 10 at 6896-97.

Plaintiffs assert that the FHWA's traffic increase projection and noise study are flawed and that

new development in the floodplain is purely speculative. Doc. #48 at 49-51.[43] The FHWA concedes that it inadvertently omitted 38,000 vehicles per day from its traffic increase projections, but asserts that this omission has little impact on its conclusion because Haskell Avenue will be moved roughly 1,000 feet away from the farm property under the 32B Alternative. Doc. #55 at 44. The Court agrees and finds that this omission is harmless.

With respect to noise, plaintiffs assert that the FHWA grossly overstated the noise the 42A Alternative would generate on streets surrounding Haskell Farm. Doc. #48 at 44-45. Plaintiffs argue that the noise maps overstate the 42A noise impact and understate the 32B noise impact. They show that the 42A noise map includes noise impacts that do not reach the Haskell Farm and are not considered in the 32B study, namely noise impacts east of Haskell Avenue and west of Louisiana Street. See id. The FHWA, however, does not rely on noise impact data taken east of Haskell Avenue, west of Louisiana Street or south of the Wakarusa River. It exclusively relies on the residual noise impacts generated by traffic on Haskell Avenue and Louisiana Street. See Final Section 4(f) Evaluation, AR,

---

[43]    Plaintiffs attack the FHWA traffic increase projections because they excluded from the estimate 38,000 cars on Haskell Avenue between 31st Street and the 32B Alternative. Doc. #48 at 49-51. In Exhibit 6, plaintiffs generated their own traffic volume estimates. See Ex. 6 attached to Doc. #48. The FHWA moves to strike Exhibit 6 because it contains new, extra-record evidence which the Court may not consider except in certain limited circumstances. Doc. #53 at 5. Plaintiffs argue that the data in Exhibit 6 are taken straight from the administrative record and therefore constitute permissible argument or "pedagogical devices" and not new evidence. Doc. #58 at 3-4. However, as Exhibit 6 clearly explains, plaintiffs attempt to "correct" FHWA calculations that they think are incorrect. Specifically, to account for the 38,000 vehicles per day, plaintiffs engage in a complicated computation to take the weighted average of traffic volume for this stretch of road and apply it to their computation. Plaintiffs have not shown where their calculations appear in the record and they cannot properly be construed as mere argument; instead, Exhibit 6 must be viewed as new evidence. Because the Court is constrained by the four corners of the administrative record, except in rare circumstances, the Court sustains defendants' motion to strike Exhibit 6. See Citizens for Alts. to Radioactive Dumping, 485 F.3d at 1096. Moreover, Exhibit 6 is unnecessary to prove plaintiffs' point because the FHWA concedes that it inadvertently omitted 38,000 vehicles per day from its traffic increase projections. Doc. #55 at 44.

Vol. 10 at 6887-89. It seems that the FHWA did not consider the noise impact of traffic on Haskell Avenue and Louisiana Street for the 32B Alternative because these streets would be moved away from the Haskell Farm under the 32B mitigation plan. See id. at 6889, 6896-97. It concluded that, due to 32B mitigation measures (*i.e.* noise walls around the 32B roadway and moving Haskell Avenue and Louisiana Street away from the Haskell Farm), "the total audible disturbance associated with [the 32 B Alternative] will be less by the year 2025 . . . than noise disturbances from adjacent roads associated with the 42A Alternative." Id. at 6896-97.

Contrary to plaintiffs' claim, the FHWA does not overstate the possibility that development could occur in the floodplain adjacent to the Haskell Farm. Rather, it acknowledges that "urban development in the floodplain is not recommended" but "may be approved if it complies with the local floodplain regulations." Id. at 6896. It further notes that a "portion of the land located immediately west of Baker Wetlands was platted for multi-family development." Id. KDOT currently owns this land and plans to convert the land to wetlands as part of the 32B mitigation plan; if the 32B Alternative is not selected, however, the land will return to private hands to be developed. Id. According to the FHWA, this development would "diminish or eliminate the rural character of the land." Id.

Under the 32B Alternative, a four-lane highway with 12-foot noise walls would bisect the Haskell Farm and Baker Wetlands. Id. It would directly impact the Haskell Farm, but the FHWA concluded that it would nonetheless have fewer cumulative secondary impacts than 42A. Id. The FHWA's Final Section 4(f) Evaluation acknowledges that "visual impacts may occur as a result of walls being constructed for the purpose of noise mitigation," but concludes that the visual obstruction would be minimal because the walls would be located behind second-growth trees and, eventually, an evergreen tree screen. Id. Furthermore, because the 32B Alternative mitigation package expands the

Baker Wetlands surrounding the Haskell Farm, no development would be allowed on or around farm property. See id. The FHWA reached its conclusions regarding the cumulative and secondary impacts on the Haskell Farm through reasoned – not arbitrary or capricious – analysis. The Court therefore concludes that the FHWA properly considered these impacts in reaching its determinating that the 42A Alternative is imprudent.

6.    Additional Adverse Environmental Impacts

The FHWA determined that the 42A Alternative would impact four more acres of riparian woodlands and 8.6 more acres of upland woodlands than the 32B Alternative. Final Section 4(f) Evaluation, AR, Vol. 10 at 6897. It also concluded that the 42A Alternative would be situated near the Oregon and California National Historic Trail, including Blanton's Crossing, a bridge which the National Park Service has identified as a "High Potential Site" for its importance as a trail resource and its role in western migration and "Bleeding Kansas." Id.[44]   According to the FHWA, the 42A

_____

[44]    Plaintiffs take issue with the FHWA's statement that the 42A Alternative would lie in the area of Blanton's Crossing. Doc. #58. They primarily rely on their map in Exhibit 14 attached to Plaintiff's Opening Brief (Doc. #48) and argue that Blanton's Crossing is located 500 feet northeast of where 42A would run. Doc. #58. The FHWA moves to strike Exhibit 14 because the Court's review of administrative actions under the APA is limited, with certain narrow exceptions, to the administrative record developed by the agency. Doc. #53; Forest Guardians, 579 F.3d at 1131 (quoting Camp, 411 U.S. at 142); see also Fla. Power & Light, 470 U.S. at 743-44 (1985) (listing limited exceptions); Citizens for Alts. to Radioactive Dumping, 485 F.3d at 1096. Plaintiffs argue that the Court should take judicial notice of the map in Exhibit 14 because it is a catalogued Kansas State Historical Society record. Doc. #58 at 5.
The Court sustains the FHWA motion to strike Plaintiffs' Exhibit 14 because the map of Blanton's Crossing in Exhibit 14 is not in the administrative record and it does not fall into one of the limited exceptions. Moreover, plaintiffs' argument with respect to the location of Blanton's Crossing has no bearing on the Court's decision. Although the FHWA considered the fact that the 42A Alternative "would be aligned along the area where the Oregon and California National Historic Trail was located, including Blanton's (Bridge) Crossing located at the Wakarusa River and Louisiana Street, east of the Meair's Farmstead," Final Section 4(f) Evaluation, AR, Vol. 10 at 6897, it stated (in response to comments) that 42A "would avoid direct impacts to Blanton's Crossing." Id. at 6881.

(continued...)

Alternative would also affect a corner of the National Register-eligible William Meairs Farmstead, but any adverse effect could be mitigated by vegetative screening. Id.

Plaintiffs point out that Blanton's Crossing is not eligible for listing on the National Register of Historic Places and that it therefore should not be considered. Doc. #48 at 53. The FHWA does not contend that Blanton's Crossing is register-eligible, but notes that it is a National Park Service "High Potential Site" and that it would be indirectly impacted by 42A. These effects are relevant to the FHWA's determination. Final Section 4(f) Evaluation, AR, Vol. 10 at 6897. The FHWA admits that the 42A Alternative "would avoid direct impacts to Blanton's Crossing." Id. at 6881-82. Even though these environmental effects might be minimal, they are nevertheless relevant. Therefore the FHWA did not act arbitrarily or capriciously in considering them.

7.    32B Alternative Provides Net Benefit

The FHWA determined that the 32B Alternative mitigation plan would provide a net benefit to the Haskell Farm and Baker Wetlands which the 42A Alternative does not provide. Id. at 6897-98. The 32B mitigation plan would include 12-foot noise walls to minimize roadway disturbances on the HINU campus and the Baker Wetlands, a 10,000 square-foot Wetland and Cultural Education Center, creation of 317 acres of wetlands to replace the 53 acres of wetlands that would be destroyed by the project, relocating 31st Street 500 feet south of its present alignment between Haskell Avenue (which will be moved 1,000 feet to the east) and Louisiana Avenue (which will be moved 1,000 feet to the west), and

[44](...continued)
Moreover, the FHWA focused on 42A's impact on the area where the Oregon and California trails existed, "and the historic importance of this area in the history of western migration and of 'Bleeding Kansas,'" which the FHWA determined were "essential factors to be considered in determining which alternative is feasible and prudent, and best serves the overall public interest." Id. The FHWA did not consider, as plaintiffs suggest, direct impacts on Blanton's Crossing, so plaintiffs' argument is misplaced and Exhibit 14 is not relevant to the Court's decision.

hiking and biking trails, camp sites and parking. FEIS, AR, Vol. 2 at 605-12. Plaintiffs do not dispute the benefits of the 32B Alternative mitigation plan, but take issue with the FHWA's conclusion that the benefits provided by the mitigation plan outweigh the impact of a four-lane highway severing the Haskell Farm from the Baker Wetlands. See Doc. #48 at 60-61.[45] The FHWA, however, weighed plaintiffs' concerns, and after taking a "hard look," it concluded that the 32B Alternative mitigation plan would yield a net benefit to the Haskell Farm and Baker Wetlands. The Court is in no position to second-guess the FHWA's expert weighing of the technical considerations involved. See Boomer Lake, 4 F.3d at 1551.

Bearing in mind that Section 4(f) gives paramount importance to the preservation of protected properties, the question is whether the FHWA could have reasonably believed that the 42A Alternative posed unique problems of extraordinary magnitude based on (1) purpose and need (traffic and safety), (2) Wakarusa floodplain and floodway impacts, (3) accelerated planned and unplanned development south of the Wakarusa River, (4) secondary and cumulative impacts on Haskell Farm, (5) additional adverse environmental impacts, and (6) 32B net benefit. Overton Park, 401 U.S. at 412, 416; Boomer Lake, 4 F.3d at 1549-50 (10th Cir. 1993); see also 23 C.F.R. § 771.135. Even though the FHWA's cost estimate was clearly erroneous, and it admitted inadvertently omitting 38,000 cars from its traffic increase projections, the Court may reverse and remand only if there is a significant chance that but for these errors, the FHWA might have reached a different result. Nat'l Parks & Conservation Ass'n, 998 F.2d at 1533 (quoting Salt River Project Agric. Improvement & Power Dist., 762 F.2d at 1060-61 n.8).

---

[45] Plaintiffs do not argue that the FHWA should not have considered the 32B "net benefit;" they only argue that 32B did not create a net benefit. The regulations are unclear whether the 32B net benefit is a proper consideration in determining whether 42A is prudent, but because plaintiffs do not raise this issue, the Court assumes without deciding that the FHWA properly considered the 32B "net benefit."

On this record, the Court concludes that the FHWA acted within the scope of its authority and could have reasonably believed that the 42A Alternative involved unique problems of extraordinary magnitude that rendered it imprudent. In <u>Boomer Lake</u>, the Tenth Circuit held that an avoidance alternative was imprudent because it could not accommodate future traffic volumes, did not satisfactorily fulfill the purposes of the project and posed safety and cost concerns. <u>Boomer Lake</u>, 4 F.3d at 1550. The same is true here. An alternative that does not adequately accommodate future traffic volume may be rejected as imprudent. <u>Ass'ns Working for Aurora's Residential Env't</u>, 153 F.3d at 1131 ( alternative that does not solve existing or future traffic problems, such as congestion, may properly be rejected as imprudent); <u>Boomer Lake</u>, 4 F.3d at 1550 (inability of alternative to accommodate future traffic volumes is justification for rejecting that alternative); <u>Lake Hefner Open Space Alliance v. Dole</u>, 871 F.2d 943, 947 (10th Cir. 1989) (rejecting no-build alternative because existing streets would not be able to accommodate future traffic volumes). Here, the 42A Alternative would handle 3,634 fewer cars per day and divert less traffic from congested local streets. <u>Final Section 4(f) Evaluation</u>, <u>AR</u>, Vol. 10 at 6891. Safety concerns are also valid considerations in rejecting an alternative. <u>Boomer Lake</u>, 4 F.3d at 1550. Selecting the 42A Alternative would result in 12 more accidents per year by 2025. <u>Final Section 4(f) Evaluation</u>, <u>AR</u>, Vol. 10 at 6891. Moreover, the FHWA found that although the 42A Alternative had no direct impact on Section 4(f)-protected properties, it would ultimately have greater long-term secondary cumulative effects due to increased traffic and development in the vicinity of the Haskell Farm. <u>Final Section 4(f) Evaluation</u>, <u>AR</u>, Vol. 10 at 6895-97. In light of the purpose of Section 4(f) to protect properties like the Haskell Farm, these long-term adverse effects rise to "extraordinary magnitudes."[46] Although no single factor would justify the FHWA's rejection of the 42A Alternative,

---

[46]     Plaintiffs assert that the FHWA arbitrarily failed to consider the direct and indirect
(continued...)

the cumulative weight of the factors is enough to support the FHWA decision. See Boomer Lake, 4 F.3d at 1550. The Court might have reached a different decision after weighing the relevant factors, but its role in reviewing the FHWA decision is not to determine whether 32B or 42A is the "right" or "better" alternative. Its role is simply to determine whether the FHWA made a reasoned judgment after a hard look at the facts. Eagle Found. v. Dole, 813 F.2d 798, 804 (7th Cir. 1987); see also Marsh, 490 U.S. at 378; Mission Grp. Kan., Inc. v. Spellings, 515 F. Supp. 2d 1232, 1234-35 (D. Kan. 2007). Here, the FHWA met the statutory requirement.

> **B.    The 42C Alternative: <u>Overton Park</u> Step Two (Relevant Factors, Clear Errors)**

Plaintiffs assert that the FHWA violated Section 4(f) because it arbitrarily refused to consider

---

[46](...continued)
impacts of the 32B Alternative on the Haskell Farm and Baker Wetlands. See Doc. #48 at 46-48. Plaintiffs, however, are mistaken. The FHWA clearly admitted the obvious – that the 32B Alternative has substantial direct impacts on the Haskell Farm. Final Section 4(f) Evaluation, AR, Vol. 10 at 6863. The FHWA analysis did not, as it should not, end there. The FHWA considered the post-mitigation 32B Haskell Farm impacts, both direct and indirect, and compared them to the long-term secondary cumulative impacts of 42A. Id. at 6863-69.

Plaintiffs assert that the 32B Alternative would jeopardize the Haskell Farm's eligibility for listing on the National Register of Historic places. Doc. #58 at 7. Plaintiffs in part rely on Exhibit 15 attached to Plaintiffs' Opening Brief (Doc. #48), which is a National Register bulletin titled "How to Apply the National Register Criteria for Evaluation." The FHWA moves to strike Exhibit 15 because it is not contained in the administrative record to which the Court (with few exceptions) is limited. Doc. #53 at 5. Forest Guardians, 579 F.3d at 1131 (quoting Camp, 411 U.S. at 142); see also Fla. Power & Light, 470 U.S. at 743-44 (listing limited exceptions); Citizens for Alts. to Radioactive Dumping, 485 F.3d at 1096. Plaintiffs ask the Court to take judicial notice of the Bulletin because it is an official National Park Service publication. Doc. #58 at 5. The Court sustains defendants' motion to strike. Plaintiffs assert that the Bulletin is relevant because the Court should use it to second-guess the FHWA's judgment regarding the impact which 32B would have on the Haskell Farm. See Doc. #58 at 6-7. The FHWA concluded that the 32B Alternative would have minor sound and visual impacts on the Haskell Farm and considered these impacts in its analysis. See Final Section 4(f) Evaluation, AR, Vol. 10 at 6896-97. The Court is in no position to substitute its judgment for that of the FHWA, particularly with respect to the technical question of National Register eligibility. Therefore, the Court sustains the FHWA's motion to strike Exhibit 15.

Throughout their briefs, plaintiffs accuse defendants of improperly favoring the 32B Alternative and arbitrarily and capriciously skewing the Section 4(f) Evaluation against the 42A Alternative. The record contains no evidence, however, of such nefarious conduct.

the PBPN's proposed 42C Alternative. Doc. #60 at 59-60. Section 4(f) requires that the FHWA base its decision on a "consideration of the relevant factors" and not on "a clear error of judgment." <u>See Overton Park</u>, 401 U.S. at 416. In other words, the FHWA must examine enough alternatives to reasonably conclude that the study of additional alternative routes is not worthwhile. <u>Boomer Lake</u>, 4 F.3d at 1551; <u>Eagle Found.</u>, 813 F.2d at 807. Although the Court may reverse the FHWA decision if it finds that the FHWA did not examine a viable alternative route that would avoid the Haskell Farm, "the decision concerning which alternatives to consider is necessarily bounded by a rule of reason and practicality." <u>Boomer Lake</u>, 4 F.3d at 1551. The Court's inquiry into the facts is to be searching and careful, but "the ultimate standard of review is a narrow one." <u>Id.</u> Once the Court is satisfied that the FHWA took a "hard look" at the relevant factors, the Court may not substitute its judgment for that of the agency. <u>Davis</u>, 302 F.3d at 1114; <u>see also</u> <u>Overton Park</u>, 401 U.S. at 416.

Plaintiffs argue that the FHWA should have considered the 42C Alternative because, according to the PBPN estimate, it would cost $22.9 million less than the 42A Alternative. Doc. #62 at 16.[47] Even if the Court accepted plaintiffs' 42C cost estimate, which defendants dispute, plaintiffs do not allege that 42C would rectify any of the other deficiencies of 42A, such as safety, diverting city traffic and secondary impacts on the Haskell Farm. The FHWA could have considered innumerable alternative corridors and alignments. It was not required to do so, however; it only had to study enough routes to determine that studying more routes would not be worthwhile. The FHWA studied multiple different 42nd Street alternatives, each of which posed similar problems.

Plaintiffs do not suggest, except for cost, that the 42C Alternative would eliminate any of the

---

[47] The FHWA disputes plaintiffs' 42C cost estimate, citing the Corps of Engineers estimation that 42C would cost only $5.3 million less than the 42A Alternative, not $19 million. Doc. #55 at 42 (citing <u>Corps ROD</u>, <u>AR</u>, Vol. 3 at 1847, 2540).

problems associated with the other 42nd Street alternatives. Because cost was not the single determining factor in the FHWA's Section 4(f) Evaluation, and because the FHWA decision to select 32B was proper even without considering costs, studying the 42C Alternative in further detail would not have augmented the FHWA evaluation or changed the outcome. Moreover, the FHWA did not blindly dismiss the PBPN's 42C Alternative; it decided not to include 42C in its Section 4(f) Evaluation only after the Corps and KDOT reviewed the proposal and determined that it would increase traffic accident risks, and after the FHWA reviewed the Corps' FEIS in light of the proposal. See FHWA ROD, AR, Vol. 10 at 7441-46. Thus the FHWA did not act arbitrarily or capriciously in not considering the 42C Alternative in its Section 4(f) Evaluation.[48]

## C. Defective Noise Study: <u>Overton Park</u> Step 3 (Procedural Requirements)

Plaintiffs assert that the FHWA violated the procedural requirements for conducting noise studies by not measuring existing noise levels or determining the impact of traffic noise increases. Doc. #48 at 42-43. The FHWA argues that neither the Section 4(f) statute (49 U.S.C. § 303) nor the regulations (23 C.F.R. Part 774) require the FHWA to perform a noise study; therefore, even if the noise study was defective, it cannot be the basis for reversing the FHWA decision. Whether Section 4(f) requires the FHWA to perform a noise increase impact study that complies with 23 C.F.R. § 772 is unclear. Even if it does, the FHWA's failure to comply with the noise study regulations did not prejudice plaintiffs and is not grounds for reversal. See supra Part I.C; New Mexico ex rel. Richardson, 565 F.3d at 708.

---

[48]      Plaintiffs assert that the FHWA sabotaged the PBPN's 42C Alternative by modeling it with extreme curves. The FHWA, however, based its analysis of the 42C Alternative on a model developed by an engineer for PBPN. The FHWA made adjustments to avoid public park and school land, which plaintiffs admit were necessary. See FEIS, AR, Vol. 3 at 2532, 2539.

## Conclusion

For the foregoing reasons, the Court affirms the FHWA's ROD.

**IT IS THEREFORE ORDERED** that the Federal Highway Administration Record of Decision issued in May of 2008, of which plaintiffs sought judicial review in Plaintiffs' Amended Opening Brief (Doc. #48) filed March 23, 2010, be and hereby is **AFFIRMED**.

**IT IS FURTHER ORDERED** that the Federal Defendant's Motion To Strike Exhibits With Memorandum In Support Included (Doc. #53) filed May 28, 2010 be and hereby is **SUSTAINED IN PART** as to Plaintiffs' Exhibits 6, 14 and 15 attached to Plaintiffs' Amended Opening Brief (Doc. #48) filed March 23, 2010, and **OVERRULED** as to Plaintiffs' Exhibit 5 attached to Plaintiffs' Amended Opening Brief (Doc. #48) filed March 23, 2010.

Dated this 5th day of November, 2010 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge